UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>**REQUEST TO BE**</u>
<u>**FILED UNDER SEAL**</u>

———————————————————

United States of America,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　)　　　　Criminal No. 10-288 (ILG)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
Luis Agustin Caicedo Velandia,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
———————————————————

## MEMORANDUM OF DEFENDANT
## LUIS AGUSTIN CAICEDO VELANDIA
## WITH RESPECT TO SENTENCING

Alessandra DeBlasio
Attorney At Law
299 Broadway, Suite 1803
New York, New York 10007
(212) 321-7084
ad@adeblasiolaw.com

Luis I. Guerra
LUIS I GUERRA, P.A.
Fountain Square
15800 Pines Boulevard, Suite 206
Pembroke Pines, Florida 33027

Attorneys for Defendant Caicedo

<u>Copies By Electronic Mail To</u>:
Chambers of the Hon. I. Leo Glasser
Soumya Dayananda, Acting Chief, Narcotics & Money Laundering Section
Hiral Mehta, Assistant U.S. Attorney
Michelle B. Malko, Probation Officer

## Table of Contents

Opening Remarks ......................................................................... 1

I.    Preliminary Statement .......................................................... 2

II.   Legal Standard .................................................................. 5

III.  Substantial Assistance ........................................................ 6

    A. Significance and Usefulness of Defendant's Assistance ................... 7

    B. Truthfulness, Completeness and Reliability of Information .............. 8

    C. Nature and Extent of Defendant's Assistance ........................... 8

        Part I:  Bringing Down the Conspiracy ................................. 10
        Part II: ████████████████████████████ 18
        Part III: ███████████████████████████ 21
        Part IV: Voluntary Hand-Over of Assets ................................ 25

    D. Danger or Risk of Injury to Defendant from His Assistance .............. 26

    E. Timeliness of Defendant's Assistance ................................... 29

IV.   Section 3553(a) Factors ....................................................... 29

    A. Nature and Circumstances of the Offense, History and Characteristics
       of the Defendant ...................................................... 29

    B. Need for Sentence Imposed ............................................. 30

    C. Need to Avoid Unwarranted Sentence Disparities ........................ 31

Request for Credit for Full Time Incarcerated ................................... 34

Request for Filing under Seal .................................................. 35

Conclusion ..................................................................... 35

## EXHIBITS

A    Superseding Indictment in *U.S. v. Caicedo*, No. 08-cr-152 (MDFL), Dkt. #6
B    Sentencing Transcript, dated 1/5/12, No. 08-cr-152 (MDFL), Dkt. #66
C    Judgment, dated 7/11/11, No. 08-cr-152 (MDFL), Dkt. #64
D    Order Reducing Sentence Pursuant to Rule 35(b), dated 6/12/15, No. 08-cr-152, Dkt. #72
E    ████████████████████████████████████████████

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America, ) | |
| ) | **REQUEST TO BE FILED UNDER SEAL** |
| v. ) | |
| ) | Criminal No. 10-288 (ILG) |
| Luis Agustin Caicedo Velandia, ) | |
| Defendant. ) | |

### MEMORANDUM OF DEFENDANT
### LUIS AGUSTIN CAICEDO VELANDIA
### WITH RESPECT TO SENTENCING

The sentencing of Luis Agustin Caicedo Velandia comes before Your Honor as the epilogue to the most extraordinary multi-District narcotics-trafficking prosecution in the history of our country.  His sentencing comes at a time when Colombia's reign and rule over international narcotics-trafficking is on the wane, and as we turn to fight the Mexican cartels that have risen to fill the void.



Mr. Caicedo's contributions without hyperbole are beyond magnificent and his appearance now before this Court for sentencing caps his decade-long effort toward redemption.

## I.    Preliminary Statement

Indicted in two Districts for his role in this single Conspiracy – narcotics-trafficking

charges in the Middle District of Florida and money-laundering charges in the Eastern District of

New York – Mr. Caicedo waived extradition and signaled his desire to cooperate with U.S.

officials within days of his April 12, 2010 arrest, while still in South America.  He was the

second in the leadership rank to be arrested, and the second to cooperate.[1] ████████████

████████████████████████████████████████████████████████ – virtually all

indicted and/or arrested with some form of assistance from Mr. Caicedo.  And *all* pled guilty, in

great part due to the assistance of Mr. Caicedo, because all knew he would be the one to testify

against them if they were to go to trial.

Mr. Caicedo was sent to the Middle District of Florida first, in order to face the *primary*

charges against him, for his role in the *narcotics-trafficking part* of this Conspiracy from 2000 to

his arrest in 2010.  He pled guilty at the first opportunity to all five counts of the superseding

indictment, which included a CCE charge listing 50 predicate acts.  (Attached as **Exhibit A** is the

Superseding Indictment in the companion case, *United States v. Caicedo-Velandia*, No. 08-cr-

152, MDFL.)  On June 12, 2015, Mr. Caicedo received a time-served sentence.[2]

Now Mr. Caicedo faces sentencing on the single remaining count in this international

Conspiracy, in the companion case in this District, for his *secondary* conduct *laundering* the

---

[1] Jose Yusti-Llano, the Chief Financial Officer of the Conspiracy, was the first to be arrested, just 11 days
before Mr. Caicedo.  ████████████

[2] At his sentencing proceeding on July 11, 2011 in the Middle District of Florida in case 08-cr-152, the
District Court departed downward 10 levels from 43 to 33, to a range of 135 to 168 months, and then
varied downward to impose a term of 120 months.  *See* **Exhibit B**, Sentencing Transcript, p. 75; **Exhibit
C**, Judgment, dated 7/13/11.  Following a Rule 35 re-sentencing on June 12, 2015, the District Court
reduced the 120 month-sentence to time-served, which was 62 months of imprisonment.  *See* **Exhibit D**,
Order Reducing Sentence Pursuant to Rule 35(b), dated 6/12/15.

proceeds of his narcotics-trafficking from 2002 until 2010.  (We refer the Court to the

Presentence Investigation Report ("PSR"), which treats the cases in these two Districts as two

halves of the same Conspiracy:  "Notably, [Mr. Caicedo's] involvement in the instant [EDNY]

offense is the same conduct underlying th[e] Florida conviction and, per Guideline 4A1.2(a)(1),

no criminal history points are assigned as *all drug amounts* and the monetary proceeds associated

with the money laundering *are taken into account* in the guideline computations *for the instant*

*[money-laundering] offense*."  ███████  (italics added).)

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

     Mr. Caicedo appears now before Your Honor for sentencing – *the last* of more than 20

co-conspirators to be sentenced – having pled guilty in this District to Count One of the

superseding indictment.  Mr. Caicedo has no material objections to the factual statements and

analysis contained within the PSR.  The statutory maximum term of imprisonment for this

money-laundering portion of the Conspiracy is 20 years.  As of sentencing on January 30, 2019,

Mr. Caicedo will have served nearly 104 months (8 and 2/3 years) detained, the equivalent of

122 months (10 years, 2 months) with good time credit.

     The Government has filed a motion for downward departure pursuant to U.S.S.G. §

5K1.1, and we ask the Court to grant the motion to the very fullest extent.

This Court is entitled to sentence Mr. Caicedo to whatever sentence it deems justified and reasonable under the circumstances for his money-laundering offense.  For Mr. Caicedo – who was responsible for directing the Conspiracy's *narcotics* operations – we ask this Court for a sentence of time-served (equivalent to 122 months) as punishment.

We believe that a downward departure to time served for Mr. Caicedo's guilty plea in this District to *money-laundering* is reasonable and just and not unwarranted in light of (1) Mr. Caicedo's virtually incomparable and extraordinary cooperation, (2) the sentences of his similarly-situated co-conspirators, as well as (3) the time-served sentence that the District Court in Florida imposed for Mr. Caicedo's primary role in this Conspiracy running the *narcotics* operation, an offense that carried as a mandatory minimum the 20 years that he now faces here as a maximum. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] *See* elespectador/impreso/judicial/articuloimpreso-236457-el-capo-de-capos-se-entrego, "El capo de capos se entregó" ["The Boss of Bosses Turns Himself In"], Nov. 23, 2010.



████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████ We ask the same now for Mr. Caicedo, his release.

Other judges in this District have sentenced many of Mr. Caicedo's co-conspirators ██ ███████████████████ to *time-served sentences* for *both* narcotics-trafficking and money-laundering charges combined.  Notable among them was the organization's CFO Jose Yusti, *whose total offense level like Mr. Caicedo's was 45*.  (*Compare* ██████████████).  In 2013, Judge Johnson sentenced Yusti to a time-served sentence of approximately <u>42 months</u>.

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

## II.   Legal Standard

In *Booker*, the Supreme Court transformed the U.S. Sentencing Guidelines ("Guidelines" and "U.S.S.G.") from a mandatory scheme into an advisory resource.  *United States v. Booker*, 543 U.S. 220 (2005).  In *Gall*, the Supreme Court reiterated that "the Guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened."  *Gall v. United States*, 552 U.S. 38, 59 (2007) (internal quotation marks and citation omitted).

While the Guidelines provide "the starting point and the initial benchmark," they are "not

the only consideration." *Gall*, 552 U.S. at 49. This Court should take into account the

downward departure motion the Government filed pursuant to U.S.S.G. § 5K1.1, and it "should

then consider all of the § 3553(a) factors to determine whether they support the sentence

requested by a party." *Id.* at 49-50 (footnote omitted).

## III.     Substantial Assistance to Authorities:  Section 5K1.1 Downward Departure

We do not write this lengthy Memorandum to defend the conduct, minimize the

consequences, or diminish the import of Luis Caicedo's criminal actions.  Nobody can or should

do that.  We do not write to apologize for Mr. Caicedo's criminal actions.  Only he can do that,

and he will, in a statement before Your Honor at the time of his sentencing.

Nor do we write to state *why* Luis Caicedo did what he did.  My father Peter E. DeBlasio,

a great trial lawyer, and 65 years ago an Assistant U.S. Attorney in this very District – having

graduated from Columbia Law School where he was a student in then-Professor now-Judge

Weinstein's very first class – told me once and told me again that the *why and wherefore* of a

criminal's actions can never truly be known by those of us who are not ourselves criminals.

However, what we can do for the Court is to tell Your Honor all that Mr. Caicedo has

done toward atonement and contrition, for it is no longer the "why" of it all that is relevant, but

rather what Mr. Caicedo has chosen to do since his fall that dominates this sentencing – and that

has been extraordinary.

This sentencing is driven almost exclusively by Mr. Caicedo's extraordinary assistance to

our government.  In establishing an appropriate reduction, Section 5K1.1 of the Guidelines

permits the Court to consider (1) the significance and usefulness of the defendant's assistance,

taking into consideration the government's evaluation of the assistance rendered; (2) the

6

truthfulness, completeness, and reliability of any information or testimony provided by the

defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any

danger or risk of injury to the defendant or his family resulting from his assistance; and (5) the

timeliness of the defendant's assistance.  U.S.S.G. § 5K1.1(a).  We address each below.

A.    Significance and Usefulness of Defendant's Assistance

The significance and usefulness of Defendant Caicedo's assistance to U.S. law

enforcement is virtually without measure.

First, Mr. Caicedo was the second defendant among the many members of the

Conspiracy to be arrested – Jose Yusti was the first, arrested 11 days before Mr. Caicedo (█

█████) – and Mr. Caicedo was the second defendant to cooperate.[4]  As the second by just a

matter of days, Mr. Caicedo's timely assistance proved vital for the indictment and/or arrest of

many of the rest of the Conspiracy's members.  In addition to the timeliness of his cooperation,

his depth of knowledge of the Conspiracy enabled the U.S. government to quickly understand the

scope of the organization making it possible to arrest virtually everyone before they could go

into hiding, *and* without undue risk to the lives of the arresting agents.  He even persuaded some

of the co-conspirators to self-surrender.  Mr. Caicedo also assisted prosecutors in the Eastern

District of New York in pursuing *many traffickers peripheral to the Conspiracy*.  His substantial

assistance led to the indictment of at least nine individuals in this District alone.

Second, the significance and usefulness of Mr. Caicedo's efforts went well beyond

bringing down his own organization and peripheral Colombian traffickers.  ████████

████████████████████████████████

████████████████████████████

---

[4] Mr. Caicedo began cooperating upon arrest, while still in Argentina.  *See* **Exhibit B**, Sentencing
Transcript dated 1/5/12, Case No. 08-cr-152, MDFL, Dkt. #66 p. 49.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Third, Mr. Caicedo ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

Fourth, Mr. Caicedo voluntarily turned over to U.S. officials in Colombia $104 million in cash and, ████████████, a Colombian-registered airplane ████████████████ ████████████████.

The significance and usefulness of his assistance has been inestimable.

B. Truthfulness, Completeness and Reliability of Information

We rely on the Government's letter pursuant to U.S.S.G. § 5K1.1 as to the truthfulness, completeness and reliability of Mr. Caicedo's information throughout his time imprisoned.

C. Nature and Extent of Defendant's Assistance

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

8

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Indeed *just 15 months to the day after he was arrested*, at his July 11, 2011 sentencing in the Middle District of Florida – a Rule 35 proceeding would follow a few years later – the prosecutor advised the Court that agents from the *Eastern District of New York*, among others, had "debriefed" Mr. Caicedo "countless times . . . numerous, numerous times," and then characterized his still-nascent cooperation as follows:

> His memory, Your Honor, is beyond excellent. . . .  So what he provides us is information . . . which is of *vital importance* in relying on that information going forward in an investigation.  Mr. Caicedo-Velandia has provided information, Your Honor, that has resulted in a number of indictments, most of which are sealed, both here and in the Eastern District of New York.

Ex. B, Sent'g Tr. p. 41 (italics added).

For the many years following, Mr. Caicedo continued to meet often with agents and prosecutors from New York, Florida, Texas, Colombia and Mexico, to assist them with prosecutions both integral and peripheral to the Conspiracy. [REDACTED]

[REDACTED]

[REDACTED]

We address first, and with greater emphasis, Mr. Caicedo's role in bringing down the Conspiracy and peripheral traffickers; second, [REDACTED]

[REDACTED] ; third, [REDACTED]

[REDACTED] ; and fourth, his disgorgement of his trafficking profits.  Even

though Mr. Caicedo's substantial assistance ██████████ did not specifically benefit the

Eastern District of New York, we believe that this Court should be aware of at least some

highlights from that cooperation because it completes the picture of the extraordinary assistance

Mr. Caicedo provided to our country, in his effort to atone for all the acknowledged harm his

criminal conduct has caused us.

### Part I:  Bringing Down the Conspiracy



██████████ Bonnie Klapper ████████████████████

████ AUSA Klapper,

████████ AUSA Klapper's ████████ Assistant Klapper provided "246

nicknames of various individuals who did business with and for" the Conspiracy.  *See* Ex. B,

Sent'g Tr. p. 54.  Extraordinarily, Mr. Caicedo was able to identify and/or provide information

about *126 of those individuals*.  *Id.*



In addition to the identity information, Mr. Caicedo provided key corroborative information about the individuals in the ledgers, which was critical in obtaining indictments of the entire hierarchy of co-conspirators.  Not a single one of the Conspiracy's members went to trial – a great testament to Mr. Caicedo's assistance – but had they gone to trial, Mr. Caicedo would have testified against them and the ledgers would have provided direct evidence of their roles in narcotics trafficking and/or money laundering.

**The Structure of the Conspiracy**

Three individuals formed the leadership of the Conspiracy.  First and foremost among them was Co-Defendant Lozano, "the boss of bosses," whom this Court has already sentenced. He founded the organization, and he directed the organization's alliance with Mexico. ▇▇▇ ▇ He received 50% of the profits from the entire conspiracy. *Id.*

Second was Defendant Caicedo, who ran the narcotics operations in Colombia. Defendant Caicedo split the remaining 50% of the profits equally with Co-Defendant Silva, both earning 25%. ▇▇▇▇

Third was Co-Defendant Silva, whom this Court has already sentenced.  He managed the organization's assets and played the lead role in the money-laundering portion of the conspiracy,

receiving the narcotics proceeds from Mexico, storing them, disbursing them to conspiracy members, and paying suppliers. ████████

The Conspiracy's Chief Financial Officer, Jose Yusti, occupied the next leadership rung in the hierarchy. ██████ He was responsible for maintaining the organization's ledgers and growing the business, which more than tripled in volume under his tenure. He was Mr. Caicedo's right-hand man in Colombia and took over when Mr. Caicedo was out of the country for long stretches.

In the third tier of leadership were (1) Mr. Caicedo's brother Co-Defendant Juan Caicedo Velandia, who safeguarded and distributed the cash proceeds; (2) Co-Defendant Marentes, the chief enforcer; (3) Co-Defendant Montes, who was responsible for picking up money; (4) Juan Fernando "Mechas" Alvarez Meyendorf, who was responsible for transporting all of the Conspiracy's exports from the Pacific coast by semi-submersible boats to Central America and Mexico; and (5) Co-Defendant Cubillos, who was responsible for transporting money.

**Specific Assistance to Prosecutions in the Eastern District of New York**

Based in great part on the substantial assistance of Mr. Caicedo, AUSA Klapper and the agents in the Eastern District of New York were able to identify, locate, indict and/or arrest virtually every member of the Conspiracy and to dismantle its network. They went after lab operators and suppliers; builders of semi-submersible sea craft and crews of go-fast boats; overland short-haul and long-haul transporters; and cash handlers and money-launderers. Based in great part on the substantial assistance of Mr. Caicedo, the U.S. government seized more than $100 million in Conspiracy assets, thousands of kilograms of cocaine, and innumerable go-fast and semi-submersible boats. It was the greatest take-down in U.S. history.

The following are individuals indicted in the Eastern District of New York, whose prosecutions Mr. Caicedo assisted, and against whom he would have testified at trial. The list is ordered by criminal case number, oldest to most recent. The list does not include every co-defendant charged in a particular case, but just those against whom Mr. Caicedo provided information either leading to indictment, or leading to self-surrender, or leading to location and arrest, or corroborating facts already known to the U.S. government:

███████████████████████

- **Co-Defendant Julio Lozano Pirateque (aka "Don Julio")**, the <u>founding leader</u> of the Conspiracy who directed the Conspiracy's alliance with Mexico ████████ – Mr. Caicedo *arranged for Lozano to self-surrender* by directing him to call Mr. Caicedo's attorney Jay White during one of his proffers with agents, during which Lozano discussed retaining a lawyer and surrendering; Mr. Caicedo also *provided evidence* (namely the $104 million in assets he forfeited to U.S. officials) that would support the *EDNY money-laundering prosecution* of Lozano. ██████████

- **Co-Defendant Claudio Javier Silva Otalora**, one of the three <u>leaders</u> of the Conspiracy, who managed the Conspiracy's assets and played the lead role in their money-laundering operation, receiving proceeds from Mexico, storing them, disbursing them and paying suppliers █████ – Mr. Caicedo *corroborated* █████ *information* against Silva.











**<u>Part II</u>:** ██████████████████████









**Part III:** ████████████████████████████████

Although not specifically related to the Eastern District of New York, the <u>third</u> and very

significant part of Mr. Caicedo's assistance to U.S. law enforcement was ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████





Mr. Caicedo also provided ███████████████, accurate information regarding *other* vessels that narcotics-traffickers were using to transport narcotics through international waters. Some of the information yielded arrests and seizures; some resulted in traffickers dumping cocaine in the water before law enforcement could reach them; and some of the information was not actionable in time. Instances of successful operations follow:

- ████████████, based upon information Mr. Caicedo provided, law enforcement stopped a vessel, which was transporting cocaine from Colombia to Mexico, in the eastern Pacific; they arrested the ███ crew members who were subsequently indicted in the Middle District of Florida.

- ███████████████, Mr. Caicedo provided ███████████ ████ information regarding a speed boat in Colombian waters carrying approximately ██████████ cocaine. The agents relayed the information ███████████████, which intercepted the vessel, arrested the crew, and seized the cocaine.

- ████████████████████████████ Agents were able to arrange for the seizure of the vessel and, despite the crew jettisoning its cocaine, law enforcement recovered over ██████████ and arrested and prosecuted the crew in the Middle District of Florida.

- ████████████, Mr. Caicedo provided ███████████████ information regarding a speed boat leaving the Colombian coast with approximately ████ ██████████ of cocaine. Law enforcement spotted and stopped the vessel, recovering cocaine and arresting the crew.

- ████████████████████████████████████ Although

23

they were never able to stop and seize the vessel, it was forced to jettison large quantities of cocaine while successfully eluding capture.

Mr. Caicedo's cooperation ████████ was not solely limited to seagoing operations. He also provided ████████ a wealth of information regarding narcotics operations, transactions and targets generally. One such operation was based in Bogota, Colombia, with individuals transporting narcotics ████. Mr. Caicedo passed the information to ████████ who, together with Colombian National Police officers, were able to make several arrests and seizures. For example:



- ████████████████████ were about to travel from Bogota ████████ with cocaine in their suitcases. ████████████ the information to the Colombian Police. ████ were arrested ████ in Bogota, with kilogram quantities of cocaine in their suitcases.

- ████████, Caicedo provided information ████ that an individual ████ ████ would be traveling from Bogota ████. He would be carrying a suitcase laden with narcotics. This information was relayed to ████████████ ████ seized him and his suitcase. The information proved to be correct and ████ was arrested and the narcotics seized.

Mr. Caicedo was not just a remarkable and reliable source of information regarding ongoing narcotics operations, he also proved to be an invaluable source of information regarding historical facts, figures and individuals. On countless occasions, agents from all agencies sought Mr. Caicedo's assistance in identifying and locating targeted individuals about whom they had intriguing but insufficient evidence. (As noted above, AUSA Klapper alone sought his assistance in identifying 246 individuals.) Mr. Caicedo almost always had relevant and specific information that would assist the agents' investigations; and, if he did not know the information personally, he obtained it. His track record was stellar. Not only was Mr. Caicedo able to provide the complete legal name of an individual upon being given only a nickname, but he

either knew or obtained for the agents their Colombian national identification number (their "cedula"), photographs, and even addresses of their businesses and residences. Mr. Caicedo provided information to federal prosecutors in New York, Florida, the District of Columbia and Texas about the following *additional* individuals:



## Part IV:  Voluntary Turn-Over of Assets

The <u>fourth</u> part of Mr. Caicedo's extraordinary assistance to our government was his voluntary forfeiture of all of his cash (<u>$104 million</u>) to U.S. agents in Colombia, money that was not otherwise known to our government, and that he handed over before there was a formal cooperation agreement in place. Mr. Caicedo disclosed and disgorged the cash as a demonstration of his genuine commitment to assist the United States, a commitment he made knowing of its inherent dangers. (As Mr. Caicedo was already detained, he convinced ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ to undertake a series of well-organized covert steps to deliver all the cash that Mr. Caicedo had. Specifically, over the course of several months in 2010, Mr. Caicedo directed ▮▮ to place $50 million in cash in three vehicles around Bogota, and $54 million in an

apartment in Bogota, for the U.S. agents to retrieve.  Mr. Caicedo forfeited his three vehicles as well. ██████████)

This $104 million voluntary forfeiture was arranged for Mr. Caicedo's New York prosecution, where ███████████ was also charged.  Mr. Caicedo arranged for separate and additional money ($9 million) to be turned over in Panama ████████████████████ ████████████████ in his companion case in the Middle District of Florida.

In addition, Mr. Caicedo forfeited an airplane to DEA agents whom he was assisting.



D.   <u>Danger or Risk of Injury to Defendant from His Assistance</u>

The danger to Mr. Caicedo and his family, on account of his decision to provide substantial assistance to the American government, defies articulation.  In asserting this point, however, we never lose sight that the danger to the American public, on account of Mr. Caicedo's drug-trafficking, also defies articulation.  The danger Mr. Caicedo now faces is of his own making; but the risk he took remains a factor for the Court to consider when evaluating the overall value of his substantial assistance, as well as the sincerity of his contrition.  And for this reason, we discuss the real and imminent danger he faces on many fronts, risks he accepted in exchange for atonement.

That Mr. Caicedo was cooperating became apparent to the public in Colombia very early on in the process.  When in late 2010 he voluntarily turned in $104 million in cash and vehicles to ICE in Colombia and $9 million in cash in Panama, it leaked to the press.  As a result, people

began to threaten his family in Colombia ███████████████████████████
███████████

Then, in 2011, Mr. Caicedo's cooperation was again publicized, this time in detail and in depth, at his open-courtroom and open-docket sentencing proceeding in the Middle District of Florida. An article appeared in the Colombian national media quoting from Mr. Caicedo's sentencing hearing, announcing to the Colombian public that Mr. Caicedo informed U.S. law enforcement about drug-trafficking routes; disclosed where associates were hiding; *identified at least 126 individuals for federal prosecutor Bonnie Klapper*; recorded phone conversations with traffickers at the direction of U.S. agents; and was set to be a witness in several trials.[5] Mr. Caicedo now faces retaliation from any number of underworld figures, those either disgusted by his disloyalty, or those who have discovered that he cooperated specifically against them.

Mr. Caicedo even faces a risk of retaliation from Colombian police authorities, as information he provided to the DEA about Colombian police corruption was leaked. In an interview in Colombia's *El Espectador*, then-Police General Cesar Augusto Pinzon stated that DEA Country Director Jay Bergman told him (Pinzon) that Mr. Caicedo and Julio Lozano were giving information against him.[6]



---

[5] ████████████████████████████████████████████████████████████████
██████████████

[6] *See* elespectador.com/noticias/judicial/si-mis-enemigos-estan-policia-articulo-356389, "Si, mis enemigos estan en la Policia," June 29, 2012.



In sum, Mr. Caicedo provided substantial assistance knowing of the *possibility* that there would be leaks to the media; and he continued to provide substantial assistance years after that possibility had become reality. The danger that Mr. Caicedo faces on account of his vast and nearly unprecedented assistance to our government cannot be overstated and, for this reason, **we also request that the courtroom be closed for the sentencing hearing**, and that the sentencing proceedings not appear on the public docket.

    E. Timeliness of Defendant's Assistance

Mr. Caicedo began cooperating from the moment of his arrest.

## IV.   18 U.S.C. § 3553(a) Factors

Pursuant to 18 U.S.C. § 3553(a), this Court may sentence Mr. Caicedo below the recommended Guidelines range based on the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, and the need to avoid unwarranted sentence disparities. Mr. Caicedo relies entirely on his substantial assistance in asking for a Guidelines departure to a sentence of time served. In addition, however, we also ask that, pursuant to 18 U.S.C. § 3553(a)(6), this Court consider the need to avoid unwarranted sentence disparities between Mr. Caicedo's sentence and those of his similarly-situated co-defendants and co-conspirators. *See United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*).

    A. Nature and Circumstances of the Offense, History and Characteristics of the Defendant

The nature and circumstances of the offense of money-laundering are set forth ███████ ████████████████ : Juan Mendez ran the money-laundering organization in Mexico that laundered the Conspiracy's profits, of which Mr. Caicedo earned 25% ████████████████

---

████████████████████████████████████████████████████

████████████████████ that Mendez would use to move the Conspiracy's money ████████; and Co-Defendant Silva received the money from Mendez ██████████, stored it, and disbursed it to Conspiracy members and used it to pay suppliers ███████. Mr. Caicedo's primary role in the Conspiracy was directing the narcotics-trafficking operation, but he benefitted from and shares secondary responsibility for the money-laundering operation.

With regard to the history and characteristics of the defendant, Mr. Caicedo claims nothing out of the ordinary. He grew up in a loving, comfortable middle-class family in 1960s and 1970s Colombia, and was able to attend university for a year. ██████████ who earned graduate degrees, and has worked his entire life in a lawful professional capacity, ████████ ███████████████████████████████████████████████████.

B. Need for Sentence Imposed

Upon arrest, Mr. Caicedo made a choice, at great risk to his safety and ultimately to that of his family, to renounce the past 15 years of his life and commit his full efforts to assist U.S. authorities. His arrest on April 12, 2010, offered him the chance to begin to atone for his criminality and, since that time 104 months ago, he has been cooperating continuously. He does not need any additional time to deter him from ever again participating in unlawful activity.

Additional time will not serve any meaningful purpose, not as rehabilitation, not for training, and not for counseling. Mr. Caicedo has been a model prisoner, and he is well educated and he has been, and has the potential to again be, a productive member of society. He has a devoted and supportive family, ██████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████.

Moreover, in addition to the term of imprisonment he has served, Mr. Caicedo will live in exile the remainder of his life.  He will forever be punished for his crimes by never being able to return to the country of his birth, due to the very serious threat of assassination.

The only purpose for continued incarceration is <u>punishment</u>, but Mr. Caicedo has by now received sufficient punishment.  He has spent a lengthy time detained – including a full year in the Secured Housing Unit when first detained ████████████████████████████ – significantly more time than his similarly-situated co-defendants and co-conspirators.

With regard to imposition of a <u>fine</u>, Mr. Caicedo has no present ability to pay a fine.  He voluntarily forfeited all of the cash he had – $104 million to agents in Colombia and $9 million to agents in Panama – and he forfeited his vehicles (and his airplane), so that what remains is property in Colombia, to which he will not be able to return or to dispose of easily.  (In the companion Florida case, the District Court imposed a total fine in the amount of $50,000 for his conviction on five counts, recognizing that while Mr. Caicedo had real property assets in Colombia, they were not readily accessible and were in forfeiture proceedings in Colombia.  *See* Ex. B, Sent'g Tr. p. 77.)  We ask that no fine be imposed here.

C.  <u>Need to Avoid Unwarranted Sentence Disparities</u>

The "primary purpose" of § 3553(a)(6) is "to reduce unwarranted sentence disparities <u>nationwide</u>."  *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2006), *abrogated on other grounds by Cavera*, 550 F.3d at 191 (underline added).  However, the *Wills* Court went on to state that "as a general matter," it does not "object to district courts' consideration of similarities and differences among <u>co-defendants</u> when imposing a sentence."  *Wills*, 476 F.3d at 110 (underline added).  *See also United States v. Gravel*, 323 Fed. Appx. 55, 2009 WL 1035207 (2d Cir. Apr. 21, 2009) ("With respect to disparities between the sentences of co-conspirators, we

31

have previously stated that 'it is appropriate for a district court . . . to impose a sentence that . . .

reflect[s] the extent to which the participants in a crime are similarly (or dissimilarly) situated

and tailor the sentences accordingly.'") (quoting *Wills*).  As it currently stands, some district

court judges within the Second Circuit routinely apply subsection (a)(6) in co-defendant cases.

*See, e.g.*, *United States v. Padilla*, 2012 WL 259169 at *6-7 (S.D.N.Y. Jan. 27, 2012) (Sweet, J.);

*United States v. Bidon*, 2006 WL 3025876 at *6 (S.D.N.Y., Oct. 24, 2006) (Sweet, J.); *United

States v. Ortiz-Zayas*, 2005 WL 1430489 at *3 (S.D.N.Y. June 17, 2005) (Sweet, J.); *Simon v.

United States*, 361 F.Supp.2d 35, 49 (E.D.N.Y. 2005) (Sifton, J.).  We ask this Court as well to

compare Mr. Caicedo to his similarly-situated co-defendants and co-conspirators.

 A time-served sentence following the nearly 104 months Mr. Caicedo has spent in

custody – the equivalent of a 122-month sentence with 15% good time credit – is neither so high

nor so low as to cause any unwarranted sentence disparities among cooperating narcotics-

traffickers in this District generally, or specifically among Mr. Caicedo's ███████████

███████.  A time-served sentence for Mr. Caicedo's money-laundering conduct equivalent to

<u>122 months</u> is significantly *more* than the following sentences of ██████████████

███████████████████:

The time that Mr. Caicedo has by now served is also 122 months longer than the money-launderers ████████████████████████████████, ever spent in prison.

Finally, we ask this Court to avoid an unwarranted disparity with the sentence Mr. Caicedo received in the Middle District of Florida for the narcotics-trafficking and Continuing Criminal Enterprise portion of this conspiracy. In Florida, Mr. Caicedo's total offense level was 43 for his guilty plea to two counts of conspiracy to distribute cocaine, one count of engagement in a CCE, and two counts of aiding and abetting the distribution of cocaine on board a vessel. The government moved for an 8-level downward departure, pursuant to § 5K1.1, noting during the July 11, 2011 sentencing hearing that the degree of the recommended departure was "rare" in that District, and that Mr. Caicedo's cooperation had been "significant" and his memory "beyond excellent." Ex. B, Sent'g Tr. pp. 40-41 & 46.

The District Court granted the government's § 5K1.1 motion and departed downward 10 levels from level 43 to 33, to a corresponding range of 135 to 168 months; then it "var[ied]" downward from the range to impose a term of 120 months. Ex. B, Sent'g Tr. p. 75. Following a Rule 35 re-sentencing on June 12, 2015, the District Court reduced the 120 month-sentence to time-served, which was equal to 62 months of imprisonment since his April 12, 2010 arrest in Argentina. Ex. D.

In light of the 62-month time-served sentence Mr. Caicedo received for the narcotics-trafficking portion of this conspiracy, which carried a potential life sentence, a sentence of time-served more than three and a half years later, for the money-laundering portion of this conspiracy, would be fair and just and not result in an unwarranted sentence disparity. Mr. Caicedo's total time incarcerated for narcotics-trafficking and money-laundering together is by now roughly equivalent to 104 months (with good time credit), which exceeds the sentences

33

████████████████████████ all received for their narcotics-trafficking and money-laundering conduct combined.

### REQUEST FOR CREDIT FOR FULL TIME INCARCERATED

As noted on Page 1 ████████, Mr. Caicedo was arrested on April 12, 2010 in Argentina. He was arrested in Argentina *at the request of the U.S. government*, for prosecution in two separate Districts for this single conspiracy. He was indicted in the Middle District of Florida on narcotics-trafficking charges in 2008, which indictment was superseded on April 15, 2010 (08-cr-152, MDFL, Dkt. #1 & #6); and he was indicted for money-laundering charges in the Eastern District of New York *on April 12, 2010*, the day of his arrest in Argentina (Dkt. #1). Mr. Caicedo has been under arrest for this conspiracy and *detained for this conspiracy* – albeit in Argentina, in Florida and in New York – since April 12, 2010.

Mr. Caicedo immediately waived extradition, but remained detained in Argentina, pending transfer to the United States, until July 14, 2010. On July 15, 2010, he was arraigned in the Middle District of Florida on the criminal indictment pending there (08-cr-152, MDFL, Dkt. #15). On September 20, 2012, he was arraigned in this District.

We request that Mr. Caicedo receive credit *for the full time he has been detained* since his day of arrest on U.S. charges – regardless of the place of arrest – which was April 12, 2010.

In the event that this Court does not impose a sentence of time-served resulting in Mr. Caicedo's immediate release from custody, we request that Your Honor's judgment in this case reflect this Court's recommendation to the Bureau of Prisons that Mr. Caicedo receive credit for time served back to and including April 12, 2010, which will facilitate the Bureau's awarding him full credit for all time incarcerated.

## REQUEST FOR FILING UNDER SEAL

Undersigned counsel respectfully requests that this defense sentencing memorandum be filed under seal.  We are sensitive to the need to minimize the amount of information in a criminal case that is filed under seal.  *See, e.g.*, *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (noting "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119-20 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored").

However, as explained above, due to the security concerns for Mr. Caicedo and his family, we respectfully request that the Court file this memorandum under seal in its entirety. *See United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995) (danger to person may be compelling reason to override public's right of access in courtroom closure context).

## CONCLUSION

Defendant Luis Caicedo's associates in the Conspiracy – the two other leaders with whom he shared power, their brilliant chief financial officer, as well as myriad lower-echelon players – all appeared a single time in a single District to answer at once for both narcotics and money-laundering charges.  Virtually all ███████████████████████████████ ████ served a single unified sentence.  This is Mr. Caicedo's second appearance, the first time in this District, to answer a second time for his conduct in this single conspiracy.  We ask that he ████████ be permitted to go home.

We believe that Mr. Caicedo's virtually incomparable and extraordinary assistance to U.S. authorities has earned him the full downward departure from the 20-year statutory maximum for this money-laundering offense to a sentence of time served.

Dated:  January 21, 2019                    Respectfully submitted,

                                            ALESSANDRA DEBLASIO
                                            LUIS GUERRA
                                            Attorneys for Luis Caicedo Velandia

cc:     Soumya Dayananda, Acting Chief, Narcotics & Money Laundering Section
        Hiral Mehta, Assistant U.S. Attorney
        Office of the U.S. Attorney for the Eastern District of New York

This document is ORDERED held by the Clerk in a vault or other secure place until further order of this Court.

            SO ORDERED:        _____

                               THE HONORABLE I. LEO GLASSER
                               UNITED STATES DISTRICT COURT
                               EASTERN DISTRICT OF NEW YORK

36

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:08-Cr-152-T-27MAP


LUIS AGUSTIN CAICEDO-VELANDIA
    a/k/a "Don Luis,"
    a/k/a "Don Lucho"

21 U.S.C. §§ 959, 960 and 963
21 U.S.C.§ 848
46 U.S.C. §§ 70503(a), 70506(a) and (b)
46 App. U.S.C. §§ 1903(a), (g) and (j)
18 U.S.C. § 2
21 U.S.C. § 853, 881 and 970 (forfeiture)
46 U.S.C. § 70507 (forfeiture)
46 App. U.S.C. § 1904 (forfeiture)
28 U.S.C. §2461(c) (forfeiture

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT ONE

### A. INTRODUCTION

At all times relevant to this superseding indictment:

1.      LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho,"

controlled maritime cocaine transportation ventures of multi-ton quantities of cocaine

from the North coast of Colombia, South America to various Central American countries

with the ultimate destination of the cocaine being the United States.


SEALED

## B. THE CONSPIRACY

2.      From an unknown date, but at least beginning in or about September 2000, through and including on or about April 12, 2010, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

who will first be brought into the United States at a point in the Middle District of Florida, did knowingly and willfully combine, conspire and agree with other persons both known and unknown to the Grand Jury, to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, contrary to the provisions of Title 21, United States Code, Section 959(a).

## C. THE MANNER AND MEANS OF THE CONSPIRACY

3.      It was part of the conspiracy that members of the conspiracy would and did manufacture cocaine in South America and elsewhere.

4.      It was further part of the conspiracy that members of the conspiracy would and did transport cocaine from the interior regions of South America and elsewhere to the areas in northern Colombia and other coastal areas of South America.

5.      It was further part of the conspiracy that members of the conspiracy would and did pay fees to members of the conspiracy for transporting the cocaine. These fees were in the form of money, a percentage of the cocaine transported, or both.

2

6.      It was further part of the conspiracy that members of the conspiracy would and did store cocaine in Colombia and elsewhere to protect it before it was smuggled into the United States and elsewhere.

7.      It was further part of the conspiracy that members of the conspiracy would and did transport cocaine by maritime vessels from the coast of South America to Mexico and ultimately to the United States.

8.      It was further part of the conspiracy that members of the conspiracy would and did explore, utilize and attempt to utilize various smuggling methods and transportation routes to facilitate the smuggling and distribution of cocaine.

9.      It was further part of the conspiracy that members of the conspiracy would and did facilitate and otherwise advance the goals and objectives of the conspiracy through threats of violence, acts of violence and intimidation.

10.      It was further part of the conspiracy that the members of the conspiracy would and did misrepresent, conceal, and hide the true purposes of acts done in furtherance of the conspiracy.

All in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B)(ii).

## COUNT TWO

### A. INTRODUCTION

1.      Paragraph 1 of the Count One of this Superseding Indictment is hereby realleged and incorporated by reference.

3

## B. THE CONSPIRACY

2.     From an unknown date, but at least beginning in or about September

2000, through and including on or about April 12, 2010, the defendant,

**LUIS AGUSTIN CAICEDO-VELANDIA,**
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

who will first be brought into the United States at a point in the Middle District of Florida,

did knowingly and willfully combine, conspire and agree with other persons both known

and unknown to the Grand Jury, to possess with intent to distribute five (5) kilograms or

more of a mixture or substance containing a detectable amount of cocaine, a Schedule

II controlled substance, on board a vessel subject to the jurisdiction of the United States.

All in violation of Title 46, United States Code, Sections 70503(a) and 70506(a)

and (b) and Title 21, United States Code, Section 960(b)(1)(B)(ii).

## C. THE MANNER AND MEANS OF THE CONSPIRACY

3.     Paragraphs 3 through 10 of the Manner and Means of the conspiracy

section of Count One of this Superseding Indictment are hereby realleged and

incorporated by reference.

## COUNT THREE

## A. INTRODUCTION

1.     Paragraph 1 of Count One of this Superseding Indictment is hereby

realleged and incorporated by reference.

4

## B. THE CONSPIRACY

2.     From an unknown date, but at least beginning in or about September 2000 and continuing thereafter up to and including on or about April 12, 2010, in the Middle District of Florida and elsewhere, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did engage in a continuing criminal enterprise by violating on three or more occasions various felony provisions of Title 21, United States Code, including but not limited to, Sections 952, 959, and 963, and which violations include among others, the violations set forth in Counts One and Two of this Superseding Indictment and the violations set forth in the "Predicate Acts" portion of this Count, which violations were part of a continuing series of violations of said statutes undertaken by the defendant in concert with five or more other persons, with respect to whom the defendant occupied a position of organizer, supervisor, and manager and from which continuing series of violations the defendant obtained substantial income and resources.

## C. THE MANNER AND MEANS OF THE CONSPIRACY

3.     Paragraphs 3 through 10 of the Manner and Means of the conspiracy section of Count One of this Superseding Indictment are hereby realleged and incorporated by reference.

5

## D. PREDICATE ACTS

### Predicate Act #1

In or around September 2000, in Colombia, South America and elsewhere, the defendant,

#### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1,050 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

### Predicate Act #2

In or around September 2000, in Colombia, South America and elsewhere, the defendant,

#### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1050 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

## Predicate Act #3

In or around March 2001, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1200 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #4

In or around March 2001, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1200

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

7

## Predicate Act #5

In or around August 2003, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or
substance containing a detectable amount of cocaine, a Schedule II controlled
substance, to wit: approximately 1050 kilograms, knowing and intending that such
substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United
States Code, Section 2.

## Predicate Act #6

In or around August 2003, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside
thereof five (5) kilograms or more of a mixture or substance containing a detectable
amount of cocaine, a Schedule II controlled substance, to wit: approximately 1050
kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title
18, United States Code, Section 2.

8

## Predicate Act #7

In or around December 2003, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1050 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #8

In or around December 2003, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1050 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

9

## Predicate Act #9

In or around early 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1700 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #10

In or around early 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1700 kilograms, in violation of Title 21, United States Code; Sections 952(a) and 963 and Title 18, United States Code, Section 2.

10

**Predicate Act #11**

In or around August 2004, in Colombia, South America and elsewhere, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2100 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

**Predicate Act #12**

In or around August 2004, in Colombia, South America and elsewhere, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2100 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

11

## Predicate Act #13

In or around August or September 2004, in Colombia, South America and

elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 2000 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #14

In or around August or September 2004, in Colombia, South America and

elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 2000

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

12

## Predicate Act #15

In or around October 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 2000 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #16

In or around October 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 2000

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

13

## Predicate Act #17

In or around October 2004, in Colombia, South America and elsewhere, the

defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1500 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #18

In or around October 2004, in Colombia, South America and elsewhere, the

defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

14

## Predicate Act #19

On or about October 21, 2004, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1684 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #20

On or about October 21, 2004, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1684

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

15

### Predicate Act #21

In or around November or December 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

### Predicate Act #22

In or around November or December 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

16

## Predicate Act #23

In or around December 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 2100 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #24

In or around December 2004, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 2100

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

17

## Predicate Act #25

In or around December 2004 or January 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #26

In or around December 2004 or January 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

18

## Predicate Act #27

In or around January 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #28

In or around January 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

19

## Predicate Act #29

On or about January 25, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
### a/k/a "Don Luis,"
### a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1428 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #30

On or about January 25, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
### a/k/a "Don Luis,"
### a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1428

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

20

## Predicate Act #31

In or around February 2005, in Colombia, South America and elsewhere, the

defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, knowing and intending that such substance would be unlawfully imported

into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #32

In or around February 2005, in Colombia, South America and elsewhere, the

defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United

States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

21

## Predicate Act #33

On or about April 16, 2005, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1909 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #34

On or about April 16, 2005, in Colombia, South America and elsewhere, the
defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1909

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

22

## Predicate Act #35

In or around April or May 2005, in Colombia, South America and elsewhere, the defendant,

**LUIS AGUSTIN CAICEDO-VELANDIA**
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #36

In or around April or May 2005, in Colombia, South America and elsewhere, the defendant,

**LUIS AGUSTIN CAICEDO-VELANDIA**
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

23

## Predicate Act #37

In or around May or June 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 1500 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #38

In or around May or June 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 1500

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

24

## Predicate Act #39

On or about June 9, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1848 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #40

On or about June 9, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1848 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

25

**Predicate Act #41**

On or about August 16, 2005, in Colombia, South America and elsewhere, the defendant,

**LUIS AGUSTIN CAICEDO-VELANDIA**
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2850 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

**Predicate Act #42**

On or about August 16, 2005, in Colombia, South America and elsewhere, the defendant,

**LUIS AGUSTIN CAICEDO-VELANDIA**
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2850 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

## Predicate Act #43

On or about October 21, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1760 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #44

On or about October 21, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1760 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

27

## Predicate Act #45

On or about December 1, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1300 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #46

On or about December 1, 2005, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 1300 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

28

## Predicate Act #47

In or around early 2006, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2000 kilograms, knowing and intending that such substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United States Code, Section 2.

## Predicate Act #48

In or around early 2006, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside thereof five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, to wit: approximately 2000 kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title 18, United States Code, Section 2.

29

## Predicate Act #49

In or around August 2006, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally distribute five (5) kilograms or more of a mixture or

substance containing a detectable amount of cocaine, a Schedule II controlled

substance, to wit: approximately 2000 kilograms, knowing and intending that such

substance would be unlawfully imported into the United States.

In violation of Title 21, United States Code, Section 959(a) and Title 18, United

States Code, Section 2.

## Predicate Act #50

In or around August 2006, in Colombia, South America and elsewhere, the defendant,

### LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and willfully attempt to import into the United States from a place outside

thereof five (5) kilograms or more of a mixture or substance containing a detectable

amount of cocaine, a Schedule II controlled substance, to wit: approximately 2000

kilograms, in violation of Title 21, United States Code, Sections 952(a) and 963 and Title

18, United States Code, Section 2.

All in violation of Title 21, United States Code, Section 848(a).

## COUNT FOUR

From an unknown date, through on or about April 16, 2005, with the Middle District of Florida being the place at which the defendant will enter the United States, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a/ "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally aid and abet persons who were on board a vessel subject to the jurisdiction of the United States, and who first entered the United States in the Middle District of Florida, in knowingly and intentionally possessing with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance.

In violation of Title 46 Appendix, United States Code, Sections 1903(a) and 1903(g), Title 18, United States Code, Section 2 and Title 21, United States Code, Section 960(b)(1)(B)(ii).

## COUNT FIVE

From an unknown date, through on or about June 9, 2005, with the Middle District of Florida being the place at which the defendant will enter the United States, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a/ "Don Luis,"
a/k/a "Don Lucho,"

did knowingly and intentionally aid and abet persons who were on board a vessel subject to the jurisdiction of the United States, and who first entered the United States in

31

the Middle District of Florida, in knowingly and intentionally possessing with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance.

In violation of Title 46 Appendix, United States Code, Sections 1903(a) and 1903(g), Title 18, United States Code, Section 2 and Title 21, United States Code, Section 960(b)(1)(B)(ii).

## FORFEITURES

1.      The allegations in Counts One through Five of this Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 21, United States Code, Sections 853 and 970; and Title 46 Appendix, United States Code, Section 1904, Title 46, United States Code, Section 70507, Title 21, United States Code, Section 881(a), and Title 28, United States Code, Section 2461(c).

2.      From his engagement in the violations alleged in Count One of this Superseding Indictment, punishable by imprisonment for more than one year, the defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a/ "Don Luis,"
a/k/a "Don Lucho,"

shall forfeit to the United States of America, pursuant to Title 21, United States Code, Sections 970 and 853(a)(1) and (2), all of his right, title, and interest in any:

a.      property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as a result of such violations; and

32

b.     property used, or intended to be used, in any manner or part to

commit, or to facilitate the commission of, such violations.

3.     From his engagement in the violations alleged in Count Two of this

Superseding Indictment, punishable by imprisonment for more than one year, the

defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

shall forfeit to the United States, pursuant to Title 46, United States Code, Section

70507, Title 21, United States Code, Section 881(a), and Title 28, United States Code,

Section 2461(c), all of his right, title, and interest in any property described in Title 21,

United States Code, Section 881(a)(1) through (11), that was used or intended for use to

commit, or to facilitate the commission of, such violations.

4.     From his engagement in the violations alleged in Count Three of this

Superseding Indictment, punishable by imprisonment for more than one year, the

defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a/ "Don Luis,"
a/k/a "Don Lucho,"

shall forfeit to the United States of America, pursuant to Title 21, United States Code,

Section 853(a)(1), (2), and (3), all of his right, title, and interest in any:

a.     property constituting, or derived from, any proceeds the defendant

obtained, directly or indirectly, as a result of such violations;

b.     property used, or intended to be used, in any manner or part to

commit, or to facilitate the commission of, such violations; and

33

c.      all of his interest in, claims against, and property or contractual

rights affording a source of control over, the continuing criminal

enterprise.

Property to be forfeited on account of the violations alleged in Count Three of this

Superseding Indictment shall include, but not be limited to, at least $4,000,000,000.00,

which constitutes the proceeds of this offense.

5.      From his engagement in the violations alleged in Counts Four and Five of

this Superseding Indictment, punishable by imprisonment for more than one year, the

defendant,

LUIS AGUSTIN CAICEDO-VELANDIA,
a/k/a "Don Luis,"
a/k/a "Don Lucho,"

shall forfeit to the United States, pursuant to Title 46 Appendix, United States Code,

Section 1904, Title 21, United States Code, Section 881(a), and Title 28, United States

Code, Section 2461(c), all of his right, title, and interest in any property described in Title

21, United States Code, Section 881(a)(1) through (11), that was used or intended for

use to commit, or to facilitate the commission of, such violations.

6.      The property to be forfeited on account of the violations alleged in Counts

One through Five of this Superseding Indictment, shall include, but not be limited to, the

following: currency, real property, personal property, conveyances, bank accounts,

jewelry, precious metals, insurance policies and other monetary and financial

instruments.

7.      If any of the property described above, as a result of any act or omission

of the defendant:

34

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), and as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL,

_____
FOREPERSON

A. BRIAN ALBRITTON
United States Attorney

_____
JEFFREY S. DOWNING
Assistant United States Attorney

_____
JOSEPH K. RUDDY
Assistant United States Attorney
Senior Deputy Chief, Narcotics

FORM OBD-34
APR 1991

No.

# UNITED STATES DISTRICT COURT

### Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.

Luis Agustin Caicedo-Velandia

## SUPERSEDING INDICTMENT

Violations:

21 U.S.C. §§ 959, 960 and 963
21 U.S.C. § 848
46 U.S.C. §§ 70503(a), 70506(a) and (b)
46 App. U.S.C. §§ 1903 (a), (g) and (j)

A true bill,

_____
Foreperson

Filed in open court this 15th day

of April 2010.

_____
Clerk

Bail   $_____

GPO 863 525

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 75 of 163 PageID #: 1496
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 1 of 80 PageID 176

1

1                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3    UNITED STATES OF AMERICA,

4        Plaintiff,

5        vs.             CASE NO:  8:08-CR-152-T-27MAP
                      11 JULY 2011
6                      TAMPA, FLORIDA
                      1:30 - 3:15 PM
7                      PAGES 1 - 80

8    LUIS AUGUSTIN CAICEDO-VELANDIA,

9        Defendant.

10   _____/

11         TRANSCRIPT OF SENTENCING PROCEEDINGS
       BEFORE THE HONORABLE JAMES D. WHITTEMORE
12         UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:    **Joseph K. Ruddy**
                      United States Attorney's Office
15                 Middle District of Florida
                      400 N. Tampa Street
16                 Suite 3200
                      Tampa, Florida 33602
17

18   For the Defendant:    **Jay A. White**
                      Law Offices of White, White &
19                  Associates
                      Suite 200
20                 1 NE 2nd Avenue
                      Miami, Florida 33132
21
                      **Jeffrey G. Brown**
22                 Brown & Doherty, P.A.
                      Suite 120
23                 450 Carillon Parkway
                      St Petersburg, Florida 33716

24   Proceedings recorded and transcribed by
   computer-aided stenography.
25

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 76 of 163 PageID #: 1497
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 2 of 80 PageID 177

2

1    Also present:   Gabriella Loncar, Spanish Interpreter

2    Court Reporter: Linda Starr, RPR
                     Official Court Reporter
3                    801 N. Florida Avenue
                     Suite 13B
4                    Tampa, Florida 33602

5

6                       I N D E X

7    Witness Name                          Page Number

     Christopher Scott Cascio
8

9    Direct Examination by Mr. Ruddy......        18
     Cross Examination by Mr. Brown.......        25
10   Redirect Examination by Mr. Ruddy....        28

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 77 of 163 PageID #: 1498
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 3 of 80 PageID 178

3

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2      Honorable Court is now in session, The Honorable

 3      James D. Whittemore presiding.

 4              Be seated, please.

 5                     P R O C E E D I N G S

 6              THE COURT:  Good afternoon.  We are here for a

 7      sentencing hearing in United States versus

 8      Caicedo-Velandia.  Let's get the appearances and

 9      then we'll swear the interpreter.  For the

10      government?

11              MR. RUDDY:  Joseph Ruddy for the government.

12              THE COURT:  For the defendant?

13              MR. WHITE:  Jay White on behalf of

14      Caicedo-Velandia who is present before the Court

15      with the assistance of an interpreter.  Also at

16      counsel table is local counsel, Jeffrey Brown.

17              THE COURT:  Good afternoon.  Let's have the

18      interpreter sworn, please.

19              COURTROOM DEPUTY CLERK:  Do you swear or

20      affirm that you will justly, truly, fairly and

21      impartially act as an interpreter in the case now

22      before the Court?

23              THE INTERPRETER:  I do.  Gabriella Loncar,

24      L-o-n-c-a-r.

25              THE COURT:  I have received and reviewed the
```

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 78 of 163 PageID #: 1499
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 4 of 80 PageID 179

4

1    presentence investigation report, as well as the

2    government's 5K1.1 motion, the defendant's omnibus

3    sentencing memorandum and the defendant's

4    supplemental sentencing memorandum.

5        The record reflects that the defendant entered

6    a guilty plea to Counts One through Five of a

7    superseding indictment charging him with conspiracy

8    to distribute five or more kilograms of cocaine, the

9    second count of conspiracy to distribute five or

10   more kilograms of cocaine onboard a vessel subject

11   to the jurisdiction of the United States, engaging

12   in a continuing criminal enterprise, and Counts Four

13   and Five with aiding and abetting individuals

14   onboard a vessel to knowingly distribute five or

15   more kilograms of cocaine.  His guilty pleas have

16   been accepted and he has been adjudicated guilty of

17   those offenses.

18       The addendum to the report indicates,

19   Mr. Ruddy, the government has no objections to the

20   report or the application of the advisory

21   guidelines.  Is that correct?

22       MR. RUDDY:  That is correct, Your Honor.

23       THE COURT:  And does the government move for

24   the additional level for acceptance of

25   responsibility?

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 79 of 163 PageID #: 1500
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 5 of 80 PageID 180

5

1           MR. RUDDY:  Yes, sir.

2           THE COURT:  That motion will be granted.

3    Mr. White, there appears to be one objection based

4    on a two-level enhancement for use of a

5    noncommercial aircraft.  I'll hear you on that, sir.

6           MR. WHITE:  Your Honor, in the case before

7    you, an aircraft other than a regularly scheduled

8    commercial air carrier was never used to actually

9    import a controlled substance into the United

10   States.  And the facts are pretty clear and

11   undisputed.

12          But I would point out, Judge, that what the

13   government's relying on here to prove the

14   enhancement is actually relevant conduct as opposed

15   to facts that are alleged in the indictment and that

16   were stated before the Court in the factual proffer.

17          The facts are such that on four occasions, a

18   private airplane was used to transport a controlled

19   substance from Central America to Haiti.  That

20   controlled substance was then sold to another

21   separate drug trafficking organization.  Payment for

22   the sale was made and the transaction was complete.

23          Then a second drug trafficking organization

24   imported the controlled substance into the United

25   States.  However, my client does not know how they

1    were imported, when they were imported or any of the

2    details of how the second drug trafficking

3    organization conducted their importation scheme.  We

4    don't know if it's by foot, by truck, by boat or

5    even by plane.

6         Your Honor, the *Chastain* case which I've cited

7    in my memorandum is a published Eleventh Circuit

8    opinion.  And in that case, the court states, "The

9    language of the guideline clearly contemplates a

10   completed event, an actual importation.  The court

11   rejected the district court's broad interpretation

12   of the plane language of the guidelines."

13        Also, the *Joelson* case, Your Honor, that I --

14   that I cited in my memo, which the *Chastain* case

15   actually cites to, they also state, "Stretching the

16   definition of used to import to incorporate any use

17   of a private plane, regardless of whether it was

18   used during the actual importation of the cocaine,

19   flies in the face of the plain language."

20        Your Honor, in that case the facts are similar

21   to the facts in this case in that a private airplane

22   was used to transport cocaine from Guatemala -- from

23   Colombia to Guatemala.  The facts in *Joelson* are

24   different than the facts in this case, Your Honor,

25   because there the coconspirators intended to import

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 81 of 163 PageID #: 1502
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 7 of 80 PageID 182

7

1       the cocaine into the United States.

2             The same thing as in *Chastain,* there was a

3       clear intent to import marijuana, that in the

4       *Chastain* case, a plane was going to bring marijuana

5       into the United States from Jamaica.  But for the

6       DEA intervention, those importations would have

7       taken place.

8             Your Honor, the *Iacullo* case, which is the

9       only case cited by -- the case the government is

10      relying on is an unpublished opinion where the --

11      where an actual importation scheme actually takes

12      place, was completed, a one-shot deal.  Even though

13      a private plane did not actually import the

14      controlled substance, a plane was used to fly the

15      cocaine to the Bahamas.

16            Well, Your Honor, in that case, the defendant

17      *Iacullo* was on the plane kicking the bales of

18      cocaine out to the boat, was in Florida when the

19      boat arrived, took the kilos of cocaine off the boat

20      in Florida, stored it in a warehouse in Florida and

21      eventually distributed it.  And in that case, Your

22      Honor, the stipulated facts, the facts agreed to by

23      the defendant and in the PSR and the factual proffer

24      in the indictment were as such.

25            The facts in this case are significantly

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 82 of 163 PageID #: 1503
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 8 of 80 PageID 183

8

1    different.  Nobody in my client's drug trafficking

2    organization can testify to the facts of the actual

3    importation into the United States, which was

4    performed by a completely separate drug trafficking

5    organization.

6        The government is asking you to hold that the

7    enhancement applies every time a controlled

8    substance is transported from one country to

9    another.  Using that logic, Your Honor, if a kilo of

10   cocaine can somehow be identified in the United

11   States as a kilo that was at one point transported

12   from Colombia to a Central American country, then

13   the person in the United States who sells that kilo

14   will be susceptible to that enhancement.

15       I'd ask the Court to not apply the enhancement

16   and sustain our objection.

17       THE COURT:  The *Chastain* case turns on the

18   fact that the conspiratorial agreement to import

19   never was accomplished; correct?

20       MR. WHITE:  Correct.  The same in *Joelson*.

21   They --

22       THE COURT:  Well, that's a distinguishing

23   feature because in this case we do have an

24   importation of cocaine into the United States.

25       MR. WHITE:  I understand that, Your Honor.

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 83 of 163 PageID #: 1504
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 9 of 80 PageID 184

9

```
 1      But the -- not by my client's drug trafficking

 2      organization, by another drug trafficking

 3      organization.  You have --

 4              THE COURT:  What did your client plead guilty

 5      to?

 6              MR. WHITE:  The indictment is a maritime --

 7      maritime conspiracy to import cocaine, paragraph --

 8              THE COURT:  And the jurisdictional nexus is

 9      what, as you understand it?

10              MR. WHITE:  I'm sorry?

11              THE COURT:  The jurisdictional nexus of that

12      conduct to the United States is what?

13              MR. WHITE:  By -- by a boat traveling in the

14      ocean.  It could be -- the defendant could be

15      charged with importing the cocaine into the United

16      States.

17              THE COURT:  Well, that's my point.  It's --

18              MR. WHITE:  But this is a unique and detailed

19      enhancement.  There's no commentary, there's no

20      policy statements.  The language says import.  I

21      mean, to give meaning to the word import means to

22      fly into the country.  I think usually --

23              THE COURT:  Your client pled guilty to

24      conspiracy to import cocaine into the United States;

25      did he not?
```

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 84 of 163 PageID #: 1505
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 10 of 80 PageID 185

10

1          MR. WHITE:  Yes, sir.

2          THE COURT:  All right.  So that conspiratorial

3     agreement began when the cocaine was picked,

4     packaged, processed, etcetera, transported to Haiti,

5     then transported to the United States in some

6     manner; correct?

7          MR. WHITE:  Correct, Judge.

8          THE COURT:  Well, then, it seems to me that

9     the distinguishing feature of this case from

10    *Chastain* is that we're not dealing strictly with the

11    intent without a consummation.  We have an intent

12    with the consummation of the importation into the

13    United States.

14         MR. WHITE:  Yes.

15         THE COURT:  And it would seem to me,

16    therefore, that the unpublished decision of *Iacullo*,

17    I-a-c-u-l-l-o, would be controlling.  Tell me why it

18    shouldn't be.

19         MR. BROWN:  Your Honor, if I could be heard

20    briefly on this same issue?  No?

21         MR. WHITE:  Well, Your Honor, because, first

22    of all, we can't identify this as being the same

23    cocaine.  In the boat example you mentioned to, the

24    cocaine that is found on the high seas is the same

25    cocaine that's presented here in court.  In this

1      situation, cocaine is given to somebody else, the

2      defendant loses control.  Yes, another organization

3      does eventually import it, but it's not one

4      importation scheme.

5           And, also, Your Honor, if -- if -- what the

6      Court's suggesting is that, really, there's no need

7      to have the word import in the guidelines.  It

8      should just be transport.  Anytime a kilo of cocaine

9      is transported from one country to another,

10     regardless of how it enters the country or who

11     introduces it, the guideline enhancement would

12     apply.  I think the word import has to be given some

13     meaning.

14          THE COURT:  Well, you do agree that the

15     cocaine that your client acknowledges transporting

16     to Haiti was destined for the United States.

17          MR. WHITE:  Judge, generally speaking, we

18     don't have any specific knowledge.  We don't know

19     how it got there.  Certainly, it's fair to say that

20     that's the direction it was heading.

21          THE COURT:  He pled guilty to Count One;

22     right?

23          MR. WHITE:  Yes, sir.

24          THE COURT:  Count One alleges in the

25     superseding indictment that the defendant controlled

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 86 of 163 PageID #: 1507
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 12 of 80 PageID 187

12

1       maritime cocaine transportation ventures on

2       multi-ton qualities -- quantities, excuse me -- of

3       cocaine from the north coast of Colombia, South

4       America, to various Central American countries with

5       the ultimate destination of the cocaine being the

6       United States.

7           The conspiracy alleges that the defendant,

8       with others, combined, conspired and agreed to

9       distribute cocaine, quote, "knowing and intending

10      that such substance would be unlawfully imported

11      into the United States," closed quote.

12          MR. WHITE:  Judge, I think that's a separate

13      conspiracy.  The cocaine that's alleged in the

14      indictment before you as you read on talks about --

15          THE COURT:  Well, that's a bit disingenuous,

16      it seems to me, Mr. White, because Mr. Ruddy is

17      going to tell you a lot more than I know about this

18      case.  All I'm doing is reading from the count to

19      which your client pled guilty.  And it alleges in

20      several instances that the cocaine was intended to

21      and was destined to be distributed into the United

22      States by way of importation.

23          MR. WHITE:  And, Judge, we --

24          THE COURT:  I don't know how you can argue

25      that your client didn't intend to import the cocaine

```
 1      into the United States, when he pled guilty to that
 2      very offense.
 3           MR. WHITE:  And the cocaine in the indictment,
 4      Your Honor, it's -- this is relevant conduct.  This
 5      is other cocaine that was sent to a country and then
 6      given to somebody to --
 7           THE COURT:  I don't follow that.  Count One
 8      doesn't charge a specific load, it just charges a
 9      conspiracy in general; doesn't it?  From September
10      of 2000 through April of 2010 in the presentence
11      report outlines a number of different go-fast
12      vessels encompassed within the conspiracy.  So how
13      do you distinguish between different cocaine?
14           MR. WHITE:  Because the relevant conduct that
15      the government's using to support the enhancement is
16      not the actual conduct that you have before you.  I
17      think in this case there needs to be between -- and
18      in the cases that we've cited, the -- there was no
19      relevant conduct.  The facts were the facts.
20           In Iacullo, the facts were that the plane
21      brought the cocaine and was imported into the United
22      States.  And we knew exactly where it was going,
23      that it was brought into the United States, where it
24      was being distributed, where it was being housed,
25      which boat took it off, where it was taken off.
```

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 88 of 163 PageID #: 1509
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 14 of 80 PageID 189

14

 1     Here the government is relying on relevant conduct

 2     to -- for the enhancement to apply, not --

 3          THE COURT:  Well, let me ask you this.  What

 4     difference does it make?  If it's relevant conduct,

 5     he's accountable for it and it certainly can support

 6     an enhancement.

 7          MR. WHITE:  Because -- because the enhancement

 8     is being applied too broadly.  It's -- the word

 9     import has to have some meaning.  And not so much

10     import, import by an airplane.  I mean, this is an

11     airplane enhancement.

12          THE COURT:  Well, in the -- I'm not arguing

13     with you.  But by Socratic debate, if you will, in

14     the *Iacullo* case, the private plane was used several

15     times to pick up cocaine in Colombia and fly it into

16     the Bahamas, and then it was smuggled into the

17     United States by -- I believe by boat.  So that

18     court didn't require that the plane actually be used

19     to import into the territorial boundary of the

20     United States; did it?

21          MR. WHITE:  No.  But the court was clear on

22     the facts that an importation scheme had occurred,

23     that it was one shot, and that the same cocaine that

24     flew on the airplane was the exact same cocaine that

25     came to Florida.  I don't think you have that here.

1              THE COURT:  All right.  Mr. Ruddy, what's your

2       response?

3              MR. RUDDY:  Your Honor, I -- as you've noted,

4       the indictment charges general conspiracies which --

5       including some overt acts that are exclusively

6       maritime transportations of cocaine.  But it is not

7       limited -- would not be limited to that in any order

8       of proof, be it at trial or at this proceeding.

9              The cocaine that was subject -- used to obtain

10      the charging document was maritime transportation.

11      But this is the same transportation organization

12      using an alternative means of smuggling, in this

13      case private aircraft, to the same locales or venues

14      in which they smuggled by maritime conveyance.

15             To acknowledge that the cocaine for one type

16      of conveyance was to be brought into the United

17      States and was imported and not another is, I would

18      submit, inconsistent.

19             And he's acknowledged and admitted that the

20      cocaine that was imported by maritime conveyance was

21      imported to the United States.  I would submit that

22      that -- it's equally reasonable that the cocaine

23      imported to other countries by aircraft, private

24      aircraft was also imported into the United States.

25             THE COURT:  Well, that's the point Mr. White

 1    is making.  Do you have evidence that that's what

 2    occurred within this conspiracy?  It is your burden.

 3        MR. RUDDY:  Yes, Your Honor.  And Agent Cascio

 4    is here.

 5        THE COURT:  Well, it seems to me, and let me

 6    make sure Mr. White agrees, that the disputed issue

 7    of fact is whether or not the cocaine that the

 8    defendant has pled guilty to conspiring to

 9    distribute and import, evidence is lacking that that

10    cocaine was transported via a private aircraft as

11    part of the conspiratorial importation or conspiracy

12    to import.  Is that right, Mr. White?

13        MR. WHITE:  We're not denying that the cocaine

14    was -- the facts of the indictment, we're absolutely

15    not denying one fact whatsoever.

16        What I'm arguing is that the four instances

17    where an airplane transported the cocaine to Central

18    America and Haiti, then -- that a separate and

19    distinct drug trafficking organization then took the

20    cocaine and brought it to the United States.

21        We do not know how that occurred, the manner

22    in which it was done, when it was done or how it was

23    done.  That's the limited --

24        THE COURT:  I'm just not following that.

25        MR. WHITE:  Not this conspiracy, Your Honor.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 91 of 163 PageID #: 1512
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 17 of 80 PageID 192

17

1           THE COURT:  You're saying that these four

2    flights were a product of a separate conspiracy --

3           MR. WHITE:  No.

4           THE COURT:  -- than what he pled to?

5           MR. WHITE:  No.

6           THE COURT:  No?

7           MR. WHITE:  Well, Your Honor, it's -- it's a

8    conspiracy but, I mean, the acts -- I guess, I'm

9    trying to -- the acts of using the airplane on these

10   four occasions that brought cocaine to a -- to a

11   transshipment point were then sold there.  That's

12   the entire conspiracy.  And the marine conspiracy in

13   this case was the transshipment of drugs to Central

14   America which would eventually be imported into the

15   United States.

16          THE COURT:  So your position is that the four

17   flights that originated in Central America fall

18   outside the conspiracy that he has pled guilty to?

19          MR. WHITE:  A different conspiracy in the

20   sense that they were done in a different manner.

21   Correct.

22          THE COURT:  All right.  Mr. Ruddy, call your

23   first witness.

24          COURTROOM DEPUTY CLERK:  Please raise your

25   right hand.

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 92 of 163 PageID #: 1513
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 18 of 80 PageID 193

18

```
 1              (Witness complied.)

 2              COURTROOM DEPUTY CLERK:  Do you swear or

 3      affirm the testimony that you give in this case will

 4      be the truth, the whole truth and nothing but the

 5      truth?

 6              THE WITNESS:  I do.

 7              COURTROOM DEPUTY CLERK:  Please be seated.

 8              (Witness complied.)

 9              COURTROOM DEPUTY CLERK:  Please state your

10      name and spell your last name for the record.

11              THE WITNESS:  Christopher Scott Cascio,

12      C-a-s-c-i-o.  Good morning.

13                        DIRECT EXAMINATION

14      BY MR. RUDDY:

15      Q       And you're employed by whom?

16      A       The Department of Justice, DEA.

17      Q       And for how long?

18      A       A little over 12 years.

19      Q       And your current assignment?

20      A       I'm currently assigned to Operation Panama

21      Express in Tampa, Florida.

22      Q       And how long have you been assigned to that

23      operation?

24      A       A little over seven years.

25      Q       Did you participate in an investigation of the
```

1    defendant here, Luis Caicedo-Velandia?

2    A    Yes, I did.

3    Q    And you're the case agent?

4    A    Yes, sir.

5    Q    There are other agents involved, but you are

6    the primary agent?

7    A    Yes, sir.

8    Q    And did you investigate Mr. Caicedo-Velandia

9    prior to 2008?

10   A    Yes.

11   Q    And was an indictment returned in that year?

12   A    Yes.

13   Q    And was a subsequent superseding indictment

14   obtained in the year 2010?

15   A    Yes.

16   Q    And did you participate in the facts of that

17   investigation?

18   A    Yes, I did.

19   Q    And that information dealt with what kind of

20   smuggling activity?

21   A    Cocaine smuggling.

22   Q    And by what means or conveyance was used?

23   A    Maritime.

24   Q    Okay.  And subsequent to -- prior to the

25   superseding indictment and subsequent to that, did

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 94 of 163 PageID #: 1515
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 20 of 80 PageID 195

20

1    you also learn of investigations in other venues in

2    the United States?

3    A    Yes.

4    Q    And what venues were that -- was that?

5    A    Eastern District of New York.

6    Q    And that involved what type of witness or

7    witnesses?

8    A    Other witnesses involving the chief security

9    officer and the chief financial officer and the

10   alleged partner of Caicedo in Mexico.

11   Q    Okay.  And what timeframe, months and years,

12   did that -- did you obtain that information?

13   A    I obtained the information beginning around

14   2009.

15   Q    Okay.  And Mr. Caicedo was arrested in the

16   spring of 2010; is that correct?

17   A    Yes, sir.

18   Q    And he was extradited to the Middle District

19   of Florida in July of last year; is that correct?

20   A    That's correct.

21   Q    During that time, prior to you having any

22   contact with Mr. Caicedo, did you learn of the

23   information possessed by these witnesses that were

24   being used in the Eastern District of New York

25   investigation?

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 95 of 163 PageID #: 1516
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 21 of 80 PageID 196

21

1    A    Yes.

2    Q    Okay.  And that involved what kind of

3    activity?

4    A    Different methods or conveyances of smuggling

5    cocaine.

6    Q    Such as?

7    A    Semi-submersible methods, airplanes, cargo,

8    vessels and land transportation organizations

9    involved in the Caicedo organization.

10   Q    Okay.  And the -- you mentioned two particular

11   witnesses at least in terms of their

12   responsibilities.

13   A    Yes, sir.

14   Q    The chief financial officer?

15   A    Yes.

16   Q    Or accountant --

17   A    Yes.

18   Q    -- generally.  And a chief of security?

19   A    Yes.

20   Q    Did you personally interview both of those

21   people?

22   A    Yes, I have.

23   Q    And did they describe to you the manner in

24   which cocaine was smuggled by this organization?

25   A    Yes.

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 96 of 163 PageID #: 1517
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 22 of 80 PageID 197

22

1    Q       And did they talk about different types of

2    conveyances that were used?

3    A       Yes, they did.

4    Q       What types of conveyances did they say were

5    used?

6    A       They affirmed the information that we had in

7    the investigation that semi-submersible conveyances,

8    cargo ships, cargo vessels, airplanes and maritime

9    transportation of the vessels.

10   Q       When you interviewed these people, did they

11   make any distinction between the types of

12   conveyances that were used?

13   A       No.

14   Q       Did they indicate to you where this cocaine

15   was intended for, ultimate destination?

16   A       Yes.

17   Q       And where?

18   A       Ultimately it was either going to be delivered

19   through Venezuela to Europe or through Venezuela to

20   Mexico, ultimately to the United States.

21   Q       Okay.  And was that by what type of

22   conveyance?

23   A       Depending.  They moved cocaine in all of those

24   conveyances to the different countries.  And if the

25   cocaine -- I had information from the defendants

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 97 of 163 PageID #: 1518
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 23 of 80 PageID 198

23

1     that some of the cocaine was flown to Mexico and

2     then moved from Mexico into the United States.

3     Q     And did they -- did these individuals indicate

4     to you whether this was common knowledge in the

5     organization?

6     A     Yes.

7     Q     And did they confirm that, in fact, cocaine

8     was smuggled by airplane from Venezuela to Mexico

9     and imported into the United States in this

10    investigation?

11    A     Yes.

12    Q     For this organization?

13    A     Yes.

14    Q     Once or multiple times?

15    A     Multiple times.

16    Q     Who was the head of the organization?

17    A     Mr. Caicedo.

18    Q     Now, you indicated that these witnesses talked

19    about some cocaine going to the United States?

20    A     Yes.

21    Q     Was there another ultimate destination for

22    some of the cocaine?

23    A     Yes, Europe.

24    Q     Okay.  And did they make that distinction?

25    A     Yes.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 98 of 163 PageID #: 1519
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 24 of 80 PageID 199

24

1    Q       Were airplanes used to smuggle cocaine to

2    Europe?

3    A       Yes.

4    Q       On one or multiple occasions?

5    A       Multiple occasions.

6    Q       And these types of aircraft, were they

7    commercial aircraft?

8    A       No, sir, private aircraft.

9    Q       Private.  Okay.  All right.  Now, you talked

10   about Venezuela to Mexico, that was one route?

11   A       Yes.

12   Q       And were there other routes used?

13   A       Other routes would be from Colombia to Mexico,

14   Colombia to Haiti, and Venezuela to Mexico.

15   Q       Okay.  And we're talking strictly about

16   airplanes here?

17   A       Yes.

18   Q       Those were the routes that were used by air

19   traffic?

20   A       Yes.

21   Q       Noncommercial?

22   A       Yes.

23   Q       In all instances?

24   A       In the instances that were explained to me by

25   the individuals that I spoke to in this

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 99 of 163 PageID #: 1520
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 25 of 80 PageID 200

25

1    investigation.

2    Q    Okay.  And that would be the chief financial

3    officer, the accountant, and the head of security?

4    A    And other individuals in the investigation.

5    Yes.

6    Q    Beyond them?

7    A    Yes.

8    Q    Now, the -- you talked to the chief financial

9    officer?

10   A    Yes.

11   Q    Did he indicate to you what the method of

12   payment was for the cocaine that was distributed and

13   imported into the United States?

14   A    Yes, he did.

15   Q    Tell us.

16   A    U.S. dollars.

17   Q    And to Europe?

18   A    Euros.

19   Q    Euros.  Okay.  Nothing further.

20        THE COURT:  Cross-examination.

21        MR. BROWN:  Thank you, Your Honor.

22                CROSS-EXAMINATION

23   BY MR. BROWN:

24   Q    Good afternoon, Agent.

25   A    Good afternoon.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 100 of 163 PageID #: 1521
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 26 of 80 PageID 201

26

```
 1    Q      All right.  The -- you would agree with me

 2    that the indictment charges what is termed as

 3    maritime cocaine transportation; correct?

 4    A      Yes.

 5    Q      Okay.  And, in fact, after you get past the

 6    first paragraph, there's a line in there on

 7    paragraph seven, page three, that again talks about

 8    transporting cocaine by maritime vessels from the

 9    coast of South America to Mexico and ultimately to

10    the United States?

11    A      I'll take your word for it.  You're looking at

12    the indictment.

13    Q      All right.  Now, outside of this indictment,

14    though, I think what you're testifying to is that

15    there was information that aircraft carrier --

16    aircraft planes were used?

17    A      Yes.

18    Q      All right.  And when we're talking about

19    aircraft, we're talking about noncommercial

20    aircraft?

21    A      Yes.

22    Q      All right.  And as far as I understand the

23    testimony, these aircraft were used to transport

24    cocaine from one South American country to another,

25    or perhaps the Caribbean or the Bahamas or Haiti?
```

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 101 of 163 PageID #: 1522
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 27 of 80 PageID 202

27

1    A       Haiti, Mexico, yes.

2    Q       Okay.  Now, were you aware of any of these

3    airplanes, again, using that definition, the

4    noncommercial, that flew the cocaine into the United

5    States?

6    A       No.

7    Q       All right.  So all of the flights that we're

8    talking about are not importing into the U.S. but

9    actually importing it from one country into another

10   outside of the U.S.?

11   A       That's correct.

12   Q       All right.  Those transport -- that importing

13   or transporting of the cocaine, it's your testimony

14   that that was a part of his organization; is that

15   right?

16   A       Yes.

17   Q       All right.  Now, you said that the cocaine

18   was -- ultimately ended up into the United States.

19   But was it his organization that was ultimately

20   responsible for that?  Through the aircraft is what

21   I'm talking about.

22   A       No.

23   Q       All right.  He -- what we're talking about is

24   his organization selling it to another organization

25   and perhaps another country?

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 102 of 163 PageID #: 1523
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 28 of 80 PageID 203

28

```
 1    A       That's not clear to me.  It might be

 2    coconspirators of his, of the organization or two

 3    organizations merging.

 4    Q       Okay.  So -- but we don't know the answer to

 5    that today?

 6    A       That's correct.

 7    Q       All right.  All we know -- strike that.

 8            Okay.  So it could possibly be two

 9    organizations merging, it could be one organization

10    selling it to another?

11    A       Right.

12    Q       However, it wasn't his organization that was,

13    as far as you know, responsible for then importing

14    it into the U.S.?

15    A       That's correct.

16    Q       Okay.

17            MR. BROWN:  Nothing further, then, Judge.

18            THE COURT:  Redirect?

19                    REDIRECT EXAMINATION

20    BY MR. RUDDY:

21    Q       The accountant, -- was the accountant able to

22    delineate which loads were smuggled by aircraft?

23    A       Yes, he was.

24    Q       Did he indicate whether those were successful?

25    A       Yes, he did.
```

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 103 of 163 PageID #: 1524
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 29 of 80 PageID 204

29

1    Q    Okay.  In every instance?

2    A    No.

3    Q    Some were unsuccessful?

4    A    Yes.

5    Q    Okay.

6         MR. RUDDY:  Nothing further, Your Honor.

7         THE COURT:  Thank you, sir.  You may step

8    down.  Watch your step, please.

9         Next witness, please.

10        MR. RUDDY:  No further witnesses, Your Honor.

11        THE COURT:  Any witnesses from the defense,

12   Mr. White?

13        MR. WHITE:  No, Your Honor.

14        THE COURT:  All right.  Mr. Ruddy, argument.

15        MR. RUDDY:  Your Honor, I'd draw to the

16   Court's attention paragraph eight of the superseding

17   indictment on page three.  It states, "It was

18   further part of the conspiracy that members of the

19   conspiracy would and did explore, utilize and

20   attempt to utilize various smuggling methods and

21   transportation routes to facilitate the smuggling

22   and distribution of cocaine."

23        I would submit that that, at least in that

24   aspect, deals with the limiting or unlimiting of the

25   alleged proof to purely maritime transportation.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 104 of 163 PageID #: 1525
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 30 of 80 PageID 205

30

1          THE COURT:  What is your response to the

2     contention that the defendant was and his

3     organization was responsible for bringing the

4     cocaine from Central America to Haiti, for example,

5     and then a different organization actually imported

6     it?  Meaning, of course, across the territorial

7     jurisdiction of the United States.

8          MR. RUDDY:  Yes, sir.  I believe the *Iacullo*,

9     and I maybe mispronouncing that case, deals -- deals

10    with that, Your Honor.  Mr. -- the defendant,

11    *Iacullo*, was a pilot whose responsibility began and

12    ended with transporting -- flying the cocaine from

13    Colombia to the Bahamas, and he was paid for that.

14         His role and participation and involvement in

15    the importation enterprise ended at that point in

16    time.  Yet he is enhanced for use of the private

17    aircraft because the cocaine was subsequently

18    imported into the United States by a maritime

19    conveyance.

20         So I would submit, Your Honor, at least if

21    we're going to rely on the authority from the

22    admittedly unpublished case, *Iacullo*, that is not --

23    not a factual distinction from the *Iacullo* case or

24    holding that the Eleventh Circuit made there.

25         THE COURT:  All right.  Thank you.  Mr. White.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 105 of 163 PageID #: 1526
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 31 of 80 PageID 206

31

1    Mr. Brown is getting nervous because he knows what

2    I'm about to tell him.

3         MR. BROWN:  Well, Your Honor, there is a

4    distinction in that case, though.

5         THE COURT:  Well, I'm talking about the

6    lawyers.

7         MR. BROWN:  Okay.

8         THE COURT:  But go ahead.  I'm going to let

9    you.  You'll be jumping up and down if you don't get

10   to talk, so go ahead.

11        MR. BROWN:  Well, there is a distinction,

12   though, with that case.

13        THE COURT:  What is the distinction?  I'm

14   serious.

15        MR. BROWN:  I know.

16        THE COURT:  I don't see it.

17        MR. BROWN:  Well, on page -- my page four of

18   that.

19        THE COURT:  Of the Eleventh Circuit case?

20        MR. BROWN:  Yes, *Iacullo*.

21        THE COURT:  All right.

22        MR. BROWN:  That begins with, according to the

23   presentence investigation report, the conspiracy

24   involved the importation of the cocaine from

25   Colombia through the Bahamas then into Florida.

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 106 of 163 PageID #: 1527
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 32 of 80 PageID 207

32

1      That's one conspiracy.

2              THE COURT:  Let me find that.

3              MR. BROWN:  Okay.

4              THE COURT:  That's page four?

5              MR. BROWN:  I have it on page four.  It's a

6      Westlaw printout so --

7              THE COURT:  Do you see maybe a headnote I

8      could find that particular --

9              MR. RUDDY:  What does it say, according to the

10     plea --

11             MR. BROWN:  Yeah.  Do you see that in a

12     headnote, according to --

13             THE COURT:  In the plea agreement, *Iacullo*

14     agreed to plead guilty to Count One, is that it?

15     No, that's not.

16             MR. RUDDY:  Your Honor, it would be page -- it

17     would be page two on the Westlaw printout, if that's

18     what you used.

19             THE COURT:  My page two just has all the

20     headnotes so --

21             MR. RUDDY:  No, page two of the body of the

22     opinion, Judge.

23             THE COURT:  All right.  I got you.  Star start

24     two, according to the presentence investigation?

25             MR. BROWN:  Right.

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 107 of 163 PageID #: 1528
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 33 of 80 PageID 208

33

1          THE COURT:  All right.  Go ahead, Mr. Brown.

2          MR. BROWN:  And it talks about that the

3     conspiracy involved the importation of multi

4     kilogram quantities of cocaine from Colombia through

5     the Bahamas and into Florida by using various

6     private aircraft.  That's -- that's what he was

7     charged with, that's what the conspiracy was.  And I

8     think he pled to those.

9          THE COURT:  That's what our presentence report

10    says; isn't it?

11         MR. BROWN:  Well, it does -- it doesn't,

12    really.  Our presentence report talks about maritime

13    importation.  What the government is --

14         THE COURT:  Well, paragraph 17 pretty much

15    spells out that noncommercial aircraft was used to

16    move cocaine from Colombia to Guatemala and to

17    Haiti.

18         MR. BROWN:  Right, ultimately used.  In other

19    words -- all right.

20         THE COURT:  It doesn't say ultimately, it says

21    specifically used.  We can't rely on what the

22    presentence report -- it may be accurate.  But what

23    you're to look at is the indictment.

24         MR. BROWN:  Right.  And the indictment charges

25    a maritime, and it breaks it down to specific --

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 108 of 163 PageID #: 1529
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 34 of 80 PageID 209

34

1    also specific offenses.  The government then says

2    under relevant conduct, there's information that an

3    aircraft was used and the enhancement should apply.

4         If it's only a question of using private

5    aircraft to import or export cocaine anywhere, then

6    I would -- I think we agree with them.  If it's

7    just a question of sometimes there being an aircraft

8    used, that's -- then we agree.

9         What it does, though, that meaning means

10   there's no reason for using the word import/export.

11   If that's how you're supposed to define it, then why

12   even use the words?  All you need to do is say, if

13   an aircraft was used that's noncommercial, the

14   enhancement applies.

15        But the enhancement doesn't say that.  It does

16   use the term import/export.  And I think the case

17   law is saying that it's either the charged

18   conspiracy or you have to prove that it was imported

19   through aircraft into the U.S.  Otherwise, it means

20   nothing.  You might as well just say if you used at

21   any point in time a noncommercial aircraft, the

22   enhancement applies.

23        So our distinction is we're agreeing that a

24   noncommercial aircraft was used to transport cocaine

25   in other countries.  All right.  Not by his

1    organization into the U.S., and there's no

2    information of his organization using a plane into

3    the U.S.

4         But if that's all the enhancement needs, in

5    other words, if you don't really have to worry about

6    importing or exporting into the U.S., if it's

7    strictly the use of a noncommercial plane anywhere,

8    then the government is right and the enhancement

9    applies.

10        We believe, though, that the word

11   import/export means import into the U.S.  This

12   conspiracy didn't charge import by aircraft into the

13   U.S.  Their argument is, well, we know of four

14   instances under relevant conduct where another

15   organization did it, but you sold the cocaine to

16   them, or we're not sure whether you even partnered

17   with them.

18        I would argue that that's not enough.  That's

19   not what the enhancement applies to.  Otherwise, all

20   cocaine would be applicable.  I mean, anytime you

21   use an aircraft, you would apply this.  I mean,

22   cocaine only grows in Colombia -- well, that's one

23   of the only places it's grown.  I know the agent

24   here would disagree with that.

25        So I think that you have to look at the word

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 110 of 163 PageID #: 1531
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 36 of 80 PageID 211

36

1    import/export and define a meaning to that, which is

2    what the case law has done.  And it means -- I

3    submit that it means import into the U.S.

4         But if this Court wants to find that the use

5    of a small plane from, say, Colombia to Haiti or

6    some other country with his organization is

7    sufficient and then he's really liable for what that

8    organization ultimately does with it, then the

9    enhancement would apply.  I just don't think that's

10   what the enhancement speaks about.

11        (Brief pause.)

12        THE COURT:  The unpublished decision of *United*

13   *States versus Iacullo*, reported at 140 Fd. Appx. 94

14   supports the government's position.  Notwithstanding

15   it is unpublished, it is precedent from this

16   circuit, which I choose to follow.

17        I don't see any meaningful distinction between

18   the cases.  In discussing the application of

19   2D1.1(b)(2)(A), the panel noted that, it was

20   undisputed that the private plane was used several

21   times to pick up cocaine in Colombia and fly it to

22   the Bahamas while the cocaine was en route to this

23   country, pointing out further that it was not

24   disputed that a private plane was used to move

25   cocaine from Colombia to Mayaguana Island, where it

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 111 of 163 PageID #: 1532
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 37 of 80 PageID 212

37

```
 1        was then placed on a vessel to smuggle into Florida.

 2              Reading from the opinion, quote, "On this

 3        record it is clear that a private plane was used

 4        within the meaning of Section 2D1.1(b)(2)(A) during

 5        the importation scheme of which Iacullo was an

 6        active participant.  Thus, the district court did

 7        not err in assessing the two-level enhancement."

 8              I will overrule the defendant's objections

 9        based on the undisputed facts that have been

10        established through the testimony of the agent that

11        the cocaine destined for the United States while en

12        route was transported by private aircraft between

13        Central America and Haiti; therefore, the two-level

14        enhancement is appropriate because a private plane

15        was used.

16              I understand the defendant's argument.

17        Certainly, one might argue, and I think the

18        defendant has in good faith, that the plain reading

19        of the subsection would support the conclusion that

20        the government must show that the nonscheduled

21        commercial air carrier was used to import or export

22        the controlled substance.

23              On the other hand, the Eleventh Circuit has

24        not read that language consistent with the

25        defendant's position and, in fact, has read it
```

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 112 of 163 PageID #: 1533
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 38 of 80 PageID 213

38

1    contrary to that argument.

2         I would note that subsection A referring to

3    the regularly scheduled commercial air carrier, that

4    is, the private plane, was then followed by a

5    reference to a submersible vessel or a

6    semi-submersible vessel -- it's hard getting this

7    out -- a submersible vessel or semi-submersible

8    vessel as described in 18 USC Section 2285 was used.

9         It would seem to me that if that entire

10   provision is read in the context of the two-level

11   enhancement, whether by use of a private airplane, a

12   semi-submersible or submersible vessel, or the

13   defendant acted as a pilot, copilot, captain,

14   navigator, flight officer, etcetera, aboard any

15   craft or vessel carrying a controlled substance,

16   read in the context of what was intended, the use of

17   a private plane as part of the scheme at any point

18   from origin to actual importation supports the

19   enhancement, and that's how I'm going to rule,

20   consistent with the Eleventh Circuit decision.

21        That it may be relevant conduct as opposed to

22   charged conduct is of no moment.  Although I'm not

23   necessarily finding that, because as I read the

24   indictment, the superseding indictment of the manner

25   and means on page three, as Mr. Ruddy points out,

1      immediately after the reference to transporting

2      cocaine by maritime vessels from the coast of South

3      America to Mexico and ultimately to the United

4      States, the grand jury alleged that it was further

5      part of the conspiracy that the conspirators would

6      and did explore, utilize and attempt to utilize

7      various smuggling methods and transportation routes

8      to facilitate the smuggling and distribution of

9      cocaine.

10         That broad characterization of various

11     smuggling methods necessarily might include

12     semi-submersibles, private aircraft, cargo ships,

13     cargo containers, etcetera.

14         Are there any other objections to the

15     application of the advisory guidelines, Mr. White?

16         MR. WHITE:  No, Your Honor.

17         THE COURT:  Let me then determine the advisory

18     guidelines, subject, of course, to the government's

19     motion under 5K2.1, which we'll take up in a moment.

20         Let me ask the interpreter, before I say

21     anything else, are you having any difficulty hearing

22     me or any of the lawyers?

23         THE INTERPRETER:  No, Your Honor, so far.

24         THE COURT:  Because we have a new sound system

25     that we're all getting used to.  This new sound

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 114 of 163 PageID #: 1535
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 40 of 80 PageID 215

40

1    system that we're all getting used to requires that

2    we stay within a very small cone of the mic, unlike

3    the old system.  It's supposed to be better, but be

4    aware, you need to be close by.

5         The advisory guidelines, then, based on the

6    undisputed facts and the facts I have now resolved

7    are as follows:

8         We have a total offense level of 43, with a

9    criminal history category Roman Numeral I.  Under

10   the advisory guidelines, that results in an advisory

11   term of life in prison, followed by five years of

12   supervised release as to Counts One, Two, Four and

13   Five; three to five years as to Count Three; a fine

14   range of $25,000 to $18 million, and a 500-dollar

15   special assessment.

16        Mr. Ruddy, your motion, docket number 58.

17        MR. RUDDY:  Yes, sir.  Your Honor, first of

18   all, I would like to make this motion not only

19   pursuant to 5K1.1, but Title 18 United States Code,

20   Section 3553(e).  The -- as you know from document

21   number 58, we are making a motion with a recommended

22   departure of eight levels.

23        As you'll know from your experience on the

24   bench here, this degree of recommended departure

25   are -- is rare.  An eight-level departure is

1    significant.  And Mr. Caicedo-Velandia's cooperation

2    has been significant.

3         He -- he has been debriefed by Agent Cascio

4    countless times and other agents in the Eastern

5    District of New York, Mexico City, Bogota, Colombia

6    and elsewhere, numerous, numerous times.  The

7    defendant has -- has done, to the extent that could

8    be assessed by myself and especially Agent Cascio,

9    everything possible within his power to provide

10   truthful, accurate and complete information.

11        His memory, Your Honor, is beyond excellent.

12   He has a detailed recollection of events and people,

13   but is also willing to admit when he is not

14   completely certain of what occurred in a particular

15   event within -- with precision.

16        So what he provides us is information that he

17   knows and to the degree and extent he can recall it,

18   which is of vital importance in relying on that

19   information going forward in an investigation.

20        Mr. Caicedo-Velandia has provided information,

21   Your Honor, that has resulted in a number of

22   indictments, most of which are sealed, both here and

23   in the Eastern District of New York.  One case, Your

24   Honor, I prefer not to give the names because of the

25   sealed indictments.

 1                    Obviously, security of -- of

 2          Mr. Caicedo-Velandia is of primary concern for

 3          obviously himself and his family, but for the

 4          government, as well.  I don't believe there are any

 5          media individuals in the courtroom here today.  But

 6          as you know, these proceedings are not sealed, so

 7          I'm just going to give you the general description

 8          of the type of case and trafficker involved.

 9                    One instance -- one indictment here in the

10          Middle District of Florida, Your Honor, involves

11          a -- what we refer to as a CPOT, consolidated

12          priority organization target.  That's the highest

13          designation of trafficker in the Justice Department.

14          And that individual was apprehended and is pending

15          extradition to Tampa, Florida.

16                    Mr. Caicedo-Velandia detailed extensive

17          dealings with this individual; as I recall,

18          acknowledged sending 30 tons of cocaine to this

19          individual throughout the course of his dealings

20          with him.  And his information was used to indict

21          that individual.  And we make this motion on the --

22          with the understanding that he will continue to

23          cooperate down the road in the event that this

24          particular individual is extradited successfully to

25          Tampa, Florida.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 117 of 163 PageID #: 1538
Case 8:08-cr-00152-JDW-MAP  Document 66   Filed 01/05/12   Page 43 of 80 PageID 218

43

 1              There's a second case that involves a number

 2      of individuals in Colombia that are probably the

 3      most significant narcotics money laundering

 4      individuals in Colombia.  They deal in the --

 5      literally the hundreds of millions if not billions

 6      of dollars in drug proceeds.

 7              Mr. Caicedo-Velandia provided information

 8      against those individuals that were utilized -- that

 9      was utilized to return an indictment against those

10      individuals.  Those individuals are also in custody

11      in Colombia and pending extradition to here in

12      Tampa, Florida.

13              There were three individuals, two separate

14      cases in the Eastern District of New York that were

15      indicted based upon Mr. Caicedo-Velandia's

16      cooperation.  His information, to the extent I'm

17      aware, these are -- these are similarly -- similar

18      caliber traffickers, Your Honor, to the first two

19      that I've mentioned here today.  These are high

20      level -- high level targets and high level

21      traffickers.

22              The defendant, again, his information was used

23      to indict those people.  And I'm unaware of their

24      status, Your Honor, if they have been apprehended

25      and are pending jurisdiction or not.  But in any

1     event, I'm assuming that they -- those indictments

2     are sealed, as well.  I'm virtually certain that

3     they are.

4          But that -- in terms of indicted cases in

5     which the defendant has cooperated and that resulted

6     in those indictments, that -- that completes that

7     aspect of his cooperation.

8          He has also cooperated in an already indicted

9     case involving a fugitive that is in Mexico out of

10    the Middle District of Florida here, and has

11    provided information in -- against that individual.

12    That individual is also a CPOT level target.

13         The defendant had provided information that

14    ultimately resulted in a seizure -- derivatively in

15    a seizure of 200 kilograms of liquid cocaine in the

16    Caribbean, and in another instance a go-fast vessel

17    carrying 475 kilograms of cocaine.  He is -- he's

18    cooperating in other investigations that may result

19    in indictments in the future.

20         Your Honor, the defendant has voluntarily

21    identified, located and surrendered over -- over a

22    hundred and -- almost $115 million in cash.  He has

23    in the year that he's been in custody here turned

24    over $104 million in drug proceeds in Colombia.  And

25    that -- that money was forfeited by the government

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 119 of 163 PageID #: 1540
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 45 of 80 PageID 220

45

1     of Colombia.

2          There was an additional $9 million which

3     was -- Mr. Caicedo-Velandia located in another

4     country in Central America and the -- totaling

5     approximately nine million, and the majority of that

6     money was brought to Tampa.  Because of the

7     agreements with the country in which that money was

8     seized, we were permitted to take that -- return

9     those funds to the -- to the United States, to

10    Tampa.

11         Now, the Middle District of Florida has never

12    read nor do I believe the Eleventh Circuit has ever

13    applied forfeitures of illegal proceeds,

14    particularly of the criminal conduct from which

15    the -- a defendant was charged can be used for -- to

16    qualify for substantial assistance.  It is not used

17    in the prosecution of another person.

18         So I mention that while I make this motion,

19    not to the idea that it not be factored into our --

20    our recommendation, but to help demonstrate to you

21    essentially two things, one good, one bad; that the

22    defendant has done everything possible to cooperate,

23    that's the good part.

24         The bad part is essentially what he did, he

25    forfeited what he had in accounts receivable.  This

 1       was money that was out there in the stream of

 2       commerce that had not been turned over to his

 3       accountant in his drug organization.

 4            It shows the -- the level of trafficker that

 5       he is, but it also shows the level of cooperation he

 6       can provide to the government in other individuals

 7       at the level in which he dealt.

 8            We make that motion for eight levels, Your

 9       Honor.  I believe that, as I said, that's a -- we

10       don't make those kind of recommendations often.  And

11       unless you have any questions, I have nothing

12       further.

13            THE COURT:  No.  I'm pondering, however -- I

14       apologize.  I don't necessarily have a question, but

15       I'm pondering the recommendation in an unrelated

16       case but of equally significant proportion in terms

17       of international drug trafficking that I presided

18       over the week before last.

19            I don't know that you're familiar with the

20       case, but there was a 12-level recommendation.  And,

21       certainly, it's the prerogative of the United States

22       Attorney's Office to determine the appropriate

23       recommendation.  But I just wondered.  There may be

24       substantial differences between the two cases that I

25       would not be aware of.  Do you know of the case I'm

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 121 of 163 PageID #: 1542
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 47 of 80 PageID 222

47

1    speaking?

2           MR. RUDDY:  If you'd give me the name.

3           THE COURT:  It was a guy from Colombia.

4    Actually, two brothers.  Ms. Chapa-Lopez was the

5    prosecutor.

6           MR. RUDDY:  Two brothers?

7           THE COURT:  Yes.

8           MR. RUDDY:  Angel Caicedo-Cabaleiro?

9           THE COURT:  Yes.

10           MR. RUDDY:  I'm familiar with that, Your

11    Honor.  That --

12           THE COURT:  That may not be fair to ask.

13           MR. RUDDY:  Yes, sir.

14           THE COURT:  But you asked if I had questions.

15    I just wondered.

16           MR. RUDDY:  Yes, sir.  That is a -- that is a

17    significant -- I am familiar with that and that is a

18    significant cooperator.  The -- at some point, Your

19    Honor, these levels of trafficker -- traffickers are

20    not contemplated by the sentencing guidelines, they

21    are so far off the charts.

22           I mean, this is a million kilos of cocaine

23    that this man's involved with.  This is four to five

24    billion dollars in drug proceeds.  This is -- the

25    Sentencing Commission could not contemplate this

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 122 of 163 PageID #: 1543
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 48 of 80 PageID 223

48

1    level of trafficker.

2         At least -- and what we try to do is evaluate

3    the level of trafficker, the degree of cooperation

4    that he has done, and couple that with what he's

5    being held accountable for in terms of the

6    sentencing guidelines, and make an appropriate

7    recommendation.

8         Now, Mr. Caicedo-Cabaleiro is -- he was shot,

9    injured, as you know.  He still has, I believe,

10   serious facial injuries as a result of that.  His

11   cooperation was delayed for years, as you well know.

12   And to the extent of completion of his cooperation,

13   Mr. Caicedo-Cabaleiro is much farther down the road

14   than this defendant here.

15        This defendant has only been here one year.

16   Sounds like a long time.  But in the scheme of

17   things of his cooperation, that's the first lap of a

18   multi-mile race.  He's got a long way to go.

19        THE COURT:  I take it from that comment that

20   you may very well be back before the Court in the

21   future?

22        MR. RUDDY:  Absolutely, Your Honor.

23        THE COURT:  All right.  Well, I think you

24   answered the question, not that you can draw many

25   comparisons.  But you asked if I had a question, I

1    certainly had one at least in my mind, although I'm

2    not questioning the assessment of the government, by

3    any means.

4         MR. RUDDY:  Yes, Your Honor.

5         THE COURT:  Is there a response from the

6    defense?

7         MR. WHITE:  Yes, Your Honor, if I can be

8    allowed to mention some additional matters not

9    brought up by Mr. Ruddy, and also if Mr. Brown can

10   be allowed to speak after I state to the Court the

11   additional matters.

12        Your Honor, the cooperation in this case

13   actually starts in Argentina.  When I flew down to

14   Argentina and met with my client on the first

15   occasion, he immediately consented to extradition

16   and he expressed his intention to cooperate.

17        Your Honor, when we talk about the money, and

18   I do have arguments why it does fit under a 5K1

19   analysis, the money was a law enforcement operation.

20   This was something that was not just surrendered in

21   Colombia over the course of a day.  This was a

22   three-month law enforcement investigation headed by

23   Agent Cascio and ICE agents down in Colombia.

24        The person responsible for doing that was Juan

25   Caicedo-Velandia, who is my client's brother.  He

1    had an arrest warrant pending.  My client was able

2    to speak to him and tell him this is what needed to

3    be done.

4         Mr. -- my client then had to send messages to

5    various money movers within Colombia to tell them

6    that they must give back this money to Juan

7    Caicedo-Velandia, the brother.

8         The money was kept in all different areas

9    throughout Colombia.  And what happened is Juan

10   Caicedo-Velandia would put money in a car.  That

11   money would then be driven to a parking lot.

12   Mr. Caicedo, the brother, would then call his

13   attorney, Luis Gerra, who would then call law

14   enforcement.  Law enforcement would then come and

15   seize the car.

16        That happened on three separate occasions,

17   totaling approximately $52 million.  And it was a

18   very dangerous operation because eventually press

19   releases were circulating in Colombia that

20   Caicedo-Velandia was giving back money.

21        I can't tell you how dangerous it can be in

22   Colombia when someone knows that you have a

23   tremendous amount of money.  The danger comes from

24   all over.  It comes from corrupt police officers --

25   Mr. -- the brother had a warrant, they were looking

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 125 of 163 PageID #: 1546
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 51 of 80 PageID 226

51

1   to arrest him.  It also comes from criminal gangs.

2   And what they're trying to do is kidnap, hold them

3   for ransom and get to the money.

4       There was also an additional money drop in an

5   abandoned apartment in the same fashion, Your Honor.

6   Approximately $52 million was put in an apartment.

7   Then the brother would call his attorney.  His

8   attorney would then call law enforcement, and the

9   seizure would take place in the apartment.

10      The -- once the press releases got out and

11  circulated, my client's family had to immediately

12  leave to Panama.  They didn't have time to even get

13  paroled into the United States.  My client's family

14  went to Panama for safe haven, and eventually,

15  thanks to the U.S. government, were paroled into the

16  country.

17      The threats and the -- and the risk of being

18  kidnapped was so great that the brother had to leave

19  the country.  From one day to the next, it was just

20  everywhere in the news, and there were just so many

21  people hunting him, hunting him.

22      Now, in Panama there was also an operation.

23  The danger factor wasn't as great.  But there was

24  also a situation where my client had to send a

25  message down to individuals in Panama that were

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 126 of 163 PageID #: 1547
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 52 of 80 PageID 227

52

1    holding the money to release those funds to Agent

2    Cascio and his Pan Ex agents, and that was done.

3    And $9 million was brought here to the United

4    States.

5        The $104 million could not, because by

6    international law, even though the money was

7    actually given to U.S. law enforcement, it had to

8    stay in Colombia.

9        So, Your Honor, I think the Court can legally

10   consider my client's surrender of drug proceeds as a

11   form of cooperation in addition to a variance.  And

12   it can do so by looking at the language of 5K1.

13   Contrary to what Mr. Ruddy may say, I do think

14   substantial assistance is defined as assisting in

15   the investigation and prosecution of another person.

16       Now, Your Honor, at the time that these money

17   surrenders were taking place, Julio Lozano, who was

18   my client's partner, was a fugitive at justice --

19   was a fugitive.  He had an arrest warrant.  We had

20   tried to encourage him to come in.  He did not want

21   to come in.  He was hiding.  He was wanted.

22       So while these money surrenders were taking

23   place, his codefendant was a fugitive.  So my

24   argument is that the surrendering of the money

25   provided direct evidence of his codefendant's money

1    laundering operations.

2         I also think it can also be considered as the

3    voluntary disclosure of the crime of another other

4    than the defendant, which is outlined in 5K2.16.

5    Also, Your Honor, 5K1.1(a)(4) directs the court to

6    consider any danger or risk or risk of injury to the

7    defendant or his family.

8         Again, what Mr. -- what his brother did was

9    extremely dangerous.  The family had to be -- had to

10   leave the country.  And thank God, nobody got hurt.

11        Your Honor, I would agree with Mr. Ruddy on

12   the two individuals that my client's information was

13   used to indict the two defendants.  One being a

14   significant target, as he said, a major drug

15   transporter; the other one being another major

16   transporter.

17        Your Honor, there was another case where my

18   client identified this individual to law enforcement

19   and then made recorded phone calls.  And this was

20   done from the Pinellas County jail.  This was a

21   money mover, someone who moved money in containers

22   for the organization.

23        Two recorded phone calls were made to this

24   individual where he confessed, he admitted in a

25   conversation with my client to moving currency for

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 128 of 163 PageID #: 1549
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 54 of 80 PageID 229

54

1   the organization.  That individual called Agent

2   Cascio two weeks later and said, when can we meet.

3          He hired a United States defense attorney.  A

4   meeting took place with Agent Cascio and his

5   attorney.  And I suspect, I don't know the details,

6   I suspect that he will soon be surrendering to

7   charges.

8          Your Honor, again, what Mr. Ruddy said about

9   the CPOT defendant is a hundred percent accurate.

10  And he will be a witness in the case once this

11  defendant does come here.  This is a very

12  significant trafficker.

13         Your Honor, also what I think is very

14  important, AUSA Bonnie Clapper, who is the AUSA

15  handling the money laundering prosecution of this

16  case in New York, provided 246 nicknames of various

17  individuals who did business with and for my

18  client's drug trafficking organization.  We're

19  talking about cocaine producers, distributors,

20  transporters, both in the Pacific, the Caribbean and

21  land transporters.

22         As you can imagine, for law enforcement to

23  secure an indictment, a target must be identified.

24  My client was able to assist law enforcement in

25  converting 126 of those nicknames, talking about

```
 1      Jose Peppe Carlos, into an actual real name.  This
 2      saved law enforcement a tremendous amount of time.
 3      Additional individuals were also named, as well.
 4              Your Honor, there was a fugitive from justice.
 5      This was an individual who had been arrested, placed
 6      bond -- set bond and fled the United States to
 7      Colombia.  He had assumed a new identity in
 8      Colombia.  This was a case that was being prosecuted
 9      in the Southern District of Florida.
10              This person -- my client knew his location,
11      knew that he was a fugitive, knew that he escaped
12      from federal courts here in Florida.  He was able to
13      provide law enforcement with the real name and
14      the -- the fake name and the real name.  Law
15      enforcement was able to confirm that that was the
16      same person.  My client gave the exact location
17      where this individual was hiding.
18              I contacted the Assistant United States
19      Attorney handling the matter.  I said, this man is
20      here, it's your case.  They -- apparently, because
21      so much time had passed, they declined prosecution
22      because they had witness problems, some of the
23      cooperating defendants had been released from
24      prison.
25              Your Honor, we've also provided the location
```

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 130 of 163 PageID #: 1551
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 56 of 80 PageID 231

56

1     of two wanted individuals.  One was an indicted

2     individual with a provisional arrest warrant who was

3     hiding in Colombia.  Again, my client provided the

4     exact location where this individual was hiding.  I

5     don't want to get into any details, but -- and my

6     client also had his individual -- had his associates

7     provide surveillance.

8          Information was passed on a daily basis to the

9     law enforcement who, in turn, had to get the

10    Colombians involved.  Four days went by.  When they

11    finally got to this location, this wanted, indicted

12    individual had fled.

13         There's another individual that was also

14    wanted in Colombia on Colombian charges, was on the

15    O-FACT list.  My client also provided the exact

16    location of that individual.  However, they were

17    unable, once again, to actually capture this person

18    for, I believe, technical matters, lack of a search

19    warrant.

20         Your Honor, there have been hundreds of

21    debriefings in this case.  My client has sent

22    messages to codefendants to surrender.  There's been

23    pictures shown, there's been identification made.

24    I'm sure there's been -- I'm sure Agent Cascio has

25    done a ton of DEA-6 reports.

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 131 of 163 PageID #: 1552
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 57 of 80 PageID 232

57

1          Agents from other districts have come, even

2     from other countries have come to speak with my

3     client, and an enormous amount of information has

4     been passed on.  Your Honor, there have been four

5     drug seizures, and I'd like to just elaborate on one

6     Mr. Ruddy talked about, the 475 kilo go-fast.

7          Again, that was a go-fast boat.  My client had

8     provided a boat to law enforcement for use.  This

9     go-fast boat had broken down on the high seas, and

10    they were looking for another boat to be able to go

11    out and rescue it.

12         So the bad guys came and asked law

13    enforcement -- or had my client's vessel, if they

14    could use their boat and their crew go rescue this

15    distressed boat.

16         The coordinates were given at that time.  The

17    coordinates were then, obviously, relayed to the

18    United States Coast Guard which seized the boat,

19    seized the 475 kilos of cocaine, and four arrests

20    were made.  And as Mr. Ruddy also points out, there

21    was 200 gallons of liquid cocaine.  I don't know how

22    much that -- kilos that is, but that was actually

23    seized at a Colombian port.

24         Your Honor, the two other -- two other matters

25    involved drug seizures.  One was a courier who was

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 132 of 163 PageID #: 1553
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 58 of 80 PageID 233

58

1    traveling from the Colombia, Bogota airport.  That

2    information which passed on to law enforcement,

3    including his clothing description, his name, what

4    flight he was going to be traveling on.  That

5    information was passed on to DEA in Bogota.

6        This individual had received seven kilos of

7    heroin inside of the airport by airport authorities.

8    Law enforcement were able to -- law enforcement was

9    able to make an arrest and seize the drugs.

10       And finally, Your Honor, there was a truck

11   that was en route to a Colombian port carrying

12   cocaine in a hidden compartment.  My client was able

13   to provide information regarding the type of truck,

14   the color of the truck, the tag, who the driver was.

15       Again, that information was passed down to law

16   enforcement and that truck was seized and

17   approximately seven -- 70 kilos of cocaine was

18   seized and three arrests.

19       Judge, there was also some go-fast boats that

20   were carrying cocaine, five in particular.  But it's

21   just very hard to get a go-fast boat traveling that

22   night close to shore.  We tried -- five CMA or

23   critical movement alerts were actually -- were

24   actually issued as a result of that.

25       There were a couple of cocaine labs, one being

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 133 of 163 PageID #: 1554
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 59 of 80 PageID 234

59

```
 1    a base cocaine lab and a powder cocaine lab.  We've

 2    provided information about its location.  We

 3    provided workers of those labs to law enforcement.

 4    Those workers were interviewed.  Those workers

 5    agreed to go on airplanes and help law enforcement

 6    locate the exact location of the labs in an effort

 7    to destroy them.  That has yet to happen.

 8         And finally, Your Honor, there has been

 9    threats of harm to a United States -- Assistant

10    United States Attorney in this country.  I won't

11    mention the name.  This person, this U.S. Attorney

12    received death threats, and as a result -- from an

13    organization that she was prosecuting.

14         As a result of that, the U.S. Marshal Service

15    was assigned to protect her 24 hours, seven days a

16    week.  This prosecutor asked my client if he could

17    provide any information about or have any idea as to

18    who may be able -- who may be behind this, and was

19    also given some information as to who the

20    organization was.

21         My client was able to try to provide

22    information as to who may be the actual individuals

23    that may be trying to cause harm to her.

24         And that's all I have as far as the

25    cooperation, Your Honor.
```

1              THE COURT:  All right.  Thank you.

2          MR. BROWN:  Your Honor, Mr. White had asked me

3      to appear as local counsel here based on our

4      discussion, I think, that we had as to how I felt

5      that having prior knowledge in the Middle District

6      as to how to evaluate this.  And as we all know, the

7      Court's going to evaluate this.

8              But I'm going to be asking on behalf of -- for

9      Mr. White on behalf of the client for 20 levels on

10     this.  I believe that 20 levels is what is fair

11     under the guidelines and prior policy of the U.S.

12     Attorney's Office in the Middle District.

13             You know, this district has chosen not to do

14     what other districts do, which is go a percentage of

15     a sentence.  I know they do that in New York.

16     Oftentimes with cooperation, you, not surprisingly,

17     get all the way to probation.  A lot of other

18     different districts do it in other ways.

19             This district, though, has repeatedly chosen

20     to give you between two to four levels for a

21     defendant's cooperation in making a new case.

22     Oftentimes, that four is definitely earned when the

23     defendant either appears at a grand jury or at a

24     trial.

25             So routinely I'm before this Court -- and for

Case 1:10-cr-00288-ILG   Document 170   Filed 10/18/19   Page 135 of 163 PageID #: 1556
Case 8:08-cr-00152-JDW-MAP   Document 66   Filed 01/05/12   Page 61 of 80 PageID 236

61

1    the last 20 years before this Court and other judges

2    within the middle district where the government is

3    only giving two levels.  And I know my client has

4    made a case of four levels, because they've

5    testified in that case.

6         But when you add up the levels in this case,

7    it far exceeds 20 if we use the formula that the

8    government has always used over the past.  And I

9    think what's happening here is that the government

10   doesn't want to have to give that many levels.  And

11   there seems to be now this saturation policy where

12   we'll give you a formula until we get to a certain

13   number and we just can't go much lower than that.

14        And I analogize this as kind of to the rules

15   of golf.  You know, I don't make the rules but --

16   and no golfer does, but we play by the rules.  And

17   it seems that at some point the rules normally

18   penalize you, but every now and then there's a rule

19   in golf that actually helps you.

20        And this is one of those rare opportunities, I

21   think, where normally we can't get enough levels and

22   in this case he's earned enough levels.  If we use

23   the formula that's always applied, it's more than

24   eight levels.  It should be at least 20 levels.

25        And so I'm going to be asking for the 20

Case 1:10-cr-00288-ILG Document 170 Filed 10/18/19 Page 136 of 163 PageID #: 1557
Case 8:08-cr-00152-JDW-MAP Document 66 Filed 01/05/12 Page 62 of 80 PageID 237

62

```
 1      levels in this case.  I know Mr. White probably

 2      feels like I'm asking for too much because he's not

 3      familiar with the middle district.  But I feel that

 4      it's appropriate.

 5           I think you have all of the reasons for that.

 6      You've got at least four indictments, not just of

 7      small, five-gram crack cases, but of huge

 8      indictments.  You've got at least appearing twice, I

 9      believe, in front of a grand jury.  You have threats

10      to the family, you have having to move the family,

11      and then you have extensive other cases, as well.

12           THE COURT:  All right.  Thank you.  I'll grant

13      the government's motion.  The extent of departure

14      I'll determine after hearing all matters in

15      mitigation.

16           I neglected to mention that I did read the

17      letters appended to the presentence report written

18      on behalf of the defendant.

19           Matters under Section 3553, gentlemen?

20           MR. WHITE:  Yes, Your Honor.

21           MR. BROWN:  Your Honor, I'm in a trial with

22      Judge Bucklew.  Can I get the Court's permission to

23      get back to that?

24           THE COURT:  Yes.

25           MR. BROWN:  Thank you.
```

1           MR. WHITE:  Your Honor, in requesting a

2    variance, I would again ask the Court to consider

3    the amount of money surrendered and the manner in

4    which it was surrendered.  The manner in which it

5    was surrendered, this is not your typical forfeiture

6    case.

7           Without a doubt, without my client's exclusive

8    assistance, the government would have never found

9    this money.  This is not a typical forfeiture case

10   where the government seizes assets, the defendant in

11   the plea agreement waives his right to contest that

12   forfeiture, waives any defenses and then the

13   government seizes the assets.

14          My client could have easily said, I don't have

15   anymore money.  I can't get to the money.  It's too

16   dangerous.  I have to be present.  But -- and the

17   government would have never found it.  But my client

18   chose to do it, Your Honor.  He chose to assist the

19   United States government in locating and

20   surrendering $114 million.

21          And I don't think -- I don't think

22   extraordinary is the proper adjective for my

23   client's actions.  I think unprecedented is the more

24   appropriate adjective.  And it is unprecedented

25   because when you compare him to other similarly

 1    situated defendants with similar charges, CCE,

 2    similar wealth who have cooperated, it simply hasn't

 3    been done.

 4         You look at some of the major traffickers that

 5    have passed through the U.S. District Courts in the

 6    last several years, the Montoya brothers, Fabio

 7    Ochoa Vasco, here a case in Tampa; Salvador Mancuso,

 8    Cuco Vanoy, Victor Patino, Ross Cuneo, and the list

 9    goes on.

10         All these defendants have accounts receivable.

11    But they do have money because a famous trafficker

12    called Cepeta, and I'm sorry I don't have real names

13    for you, $80 million was seized by the U.S.

14    government; seized, not voluntarily surrendered.

15    All these defendants cooperated, none voluntarily

16    gave back a dime.

17         My client's money surrender was done

18    immediately, it was done without hesitation, and it

19    was done without knowing the exact benefit that he

20    would receive.

21         Again, this was a law enforcement operation.

22    It was extremely dangerous.  It took several months.

23    I want to thank Agent Cascio for his professionalism

24    in allowing this to be such a successful operation.

25         So what is $114 million worth?  It's certainly

1   worth more than three levels that one gets for

2   accepting responsibility when they stand before the

3   court.

4        Your Honor, in my memo I argue that my

5   client's actions demonstrate the super acceptance of

6   responsibility.  There are no Eleventh Circuit

7   cases, as Mr. Ruddy points out, allowing courts to

8   vary based on the voluntary surrender of forfeitable

9   assets.  But by analogy, courts have allowed

10   downward departures based on extraordinary

11   presentence restitution.

12        In both instances, Your Honor, you have

13   defendants prior to sentencing agreeing to return

14   money that they have -- that they have from -- that

15   they've made from their crimes.  The actions of my

16   client of assisting and locating forfeitable assets

17   in advance of sentencing should also be viewed as

18   extreme remorse, or, as I call it in my memo,

19   proactive remorse.  Many cooperators sit down and

20   talk with the government.  My client was the first

21   to surrender drug profits.

22        This is a case of first impression, Your

23   Honor.  I don't think there's a case in the United

24   States District Court that has these facts.  Your

25   decision today should send a message.  You should

 1      encourage similarly situated drug traffickers to do

 2      the same, that is, disgorging your ill-gotten gains

 3      will be recognized by district court judges as a

 4      form of cooperation or as a ground for a variance.

 5           I'm not suggesting that traffickers can buy

 6      their way out of jail.  But forking over millions of

 7      dollars does have value.  It's the same theory

 8      behind a 5K1 and a Rule 35, courts rewarding

 9      defendants for assisting the government.

10           And when you consider its value, clearly you

11      have to consider the amount, $114 million.  Do you

12      divide by the price of a kilo in Tampa?  Kilos are

13      destroyed.  At least money is put to good use,

14      especially in a depressed economy.  And it was put

15      to good use.

16           In my memo, Your Honor, the President of

17      Colombia used $25 million of the -- of my client's

18      drug proceeds to help victims in Colombia that were

19      devastated by massive flooding.  President Obama

20      last year awarded $30 million in military aid to

21      Colombia, just to give you an idea of the magnitude

22      of the amount of money.

23           Is surrendering $114 million worth more than

24      the defendant who testifies for the government at

25      trial?  I think it should be.

1          Your Honor, just briefly I'd mention

2    sentencing disparities.  I mentioned the Pedro

3    Navarette case in my memorandum, similar charges.

4          I would like to also talk about lastly the

5    conditions of my client's confinement.  My client

6    has been in a total isolation cell for the last

7    year.  Total isolation means total isolation.  He

8    has -- 24 hours a day, seven days a week, he's in a

9    small cell by himself.  He doesn't have any

10   television.  The lights are on continuously.  He has

11   a radio that picks up one Spanish channel.

12         He occasionally gets 45 minutes of recreation

13   time, if the guards allow him.  He has to ask

14   permission when a guard listens, he doesn't speak

15   English very well, to use the phone.  He's only

16   allowed to leave his cell to see his attorney.

17         I cited the case in my memo, the *Pressley* case

18   where, on similar facts, though not as long, an

19   inmate who was held in solitary confinement in

20   Atlanta presentence, the court there held that

21   conditions of presentence confinement could support

22   a motion for downward departure, and I'd ask the

23   Court to consider that, as well.

24         Judge, the Court already mentioned that you

25   read the family letters.  Thank you.

 1          THE COURT:  Thank you, Mr. White.  Is there

 2     anything the defendant would like to say?

 3          THE DEFENDANT:  Yes.  Good afternoon, Your

 4     Honor, prosecutor, agents, attorneys.  Thank you for

 5     giving me the opportunity to express how I feel

 6     today.

 7          Throughout this year that I've been

 8     incarcerated, that I've been in prison, isolated

 9     from the jail -- rest of the jail population in an

10     isolation cell, I have had the time to re-capacitate

11     and reflect upon the damage that I caused society

12     for having committed my crimes.  And I have no

13     justification for it whatsoever, and there is no

14     justification for it whatsoever.

15          I am aware of my guilt and I deserve to be

16     punished for my actions.  And also during this year,

17     I've had the opportunity to read 77 self help books

18     and of personal growth, and they've helped me

19     greatly to change my way of thinking and to -- and

20     acting in my new life.

21          Throughout my remorse and unlimited

22     cooperation with the authorities and the government,

23     I started to make up for somehow to society -- to

24     make up for it to society.  It's the least that I

25     could do to make up for my mistakes.  And from the

```
 1          moment that I made this decision, I turned over $14

 2          million -- $114,000 that were the product of drug

 3          trafficking, and I gave information related to this

 4          crime.

 5                   And by doing that, I put my whole family in

 6          imminent threat of death.  And I am grateful to the

 7          government of the United States that helped me and

 8          facilitated their transfer -- the transfer of my

 9          family into this country.

10                   And I would also like to express my

11          appreciation, as well, for having been given the

12          opportunity to cooperate with the authorities, and

13          by doing so, to be able to provide an example of

14          growth and change to my children who are still

15          young.

16                   And I'd like to apologize to God, to the

17          United States -- to the society of the United

18          States, to my children and to my family for all the

19          damages I have caused.  Thank you.

20                   THE COURT:  Thank you, sir.  Mr. Ruddy?

21                   MR. RUDDY:  Nothing further, Your Honor.

22                   THE COURT:  Let me begin first -- Mr. Brown is

23          absent.  Let me thank him and Mr. White for your

24          presentation and Mr. Ruddy, and for the sentencing

25          memorandums which were informative.
```

```
 1              Section 3553(a) of Title 18 sets forth a
 2     series of sentencing considerations, the ultimate
 3     goal being to impose a fair sentence, one which is
 4     sufficient but not greater than necessary to satisfy
 5     these statutory purposes.
 6              I begin first by pointing out the seriousness
 7     of the offense for which this defendant has pled
 8     guilty and accepted responsibility.  Rarely in the
 9     courts of this country do you see the size and
10     complexity represented by these conspiracies in
11     these cases, including this one.  We are beginning
12     to see them because of the successful efforts of law
13     enforcement.  They are, simply put, mind boggling.
14     The amount of money and cocaine involved gives one
15     pause.
16              The seriousness of the offense should be
17     reflected by the sentence.  It's not just the use of
18     cocaine.  It's the devastating impact of that
19     substance on this country, on the neighborhoods of
20     this country when that cocaine is converted to
21     crack, and the destruction and economic damage
22     resulting from not only the use and the trafficking
23     of cocaine, but the attendant economic crimes and
24     any number of criminal offenses which can be tied
25     directly to the use and abuse of crack cocaine and
```

 1     powder cocaine.

 2          This country has invested untold millions and

 3     billions of dollars in combatting drug trafficking.

 4     Notwithstanding the staggering amount of

 5     disgorgement this defendant has voluntarily made, I

 6     would only speculate that it's significantly less

 7     than what this country has invested in investigating

 8     and prosecuting individuals like this defendant.

 9          It's unfortunate.  One, that the crimes are

10     committed but, two, that this country has to devote

11     significant resources to combatting these types of

12     offenses.  And that is why this defendant scores out

13     to life.  And life in the federal system is life.

14          He has to his credit done what he can to put

15     himself in the best position he can be in at this

16     juncture, including but not limited to his voluntary

17     disgorgement of in excess of $114 million.  And he

18     has cooperated.

19          Words like significant, beyond excellent

20     memory, countless debriefings, having done

21     everything possible to provide information, those

22     are strong words and indicative of the weight the

23     government gives to this defendant's cooperative

24     efforts, and those will, no doubt, continue.

25          There are two perspectives on cooperation,

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 146 of 163 PageID #: 1567
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 72 of 80 PageID 247

72

1    Senor, that I see.  One is you have provided

2    significant, substantial, extraordinary cooperation,

3    which is a good thing.  But on the other hand, you

4    are in a position to have done so, which is not such

5    a good thing.  The higher up in these drug

6    trafficking organizations, the more an individual

7    can offer by way of substantial assistance.

8        And I recall as I sit here in every one of

9    these sentencings these poor crewmen onboard these

10   go-fasts who are serving, at least from my

11   perspective, anywhere from six or seven to 21 years

12   in United States prisons without the ability to

13   provide information and cooperation.  Some of them

14   will die in prison, no doubt.  Most of them will

15   languish, lose contact with their families.  And you

16   must shoulder that responsibility.

17       I'm not here to send a message, Mr. White.  I

18   appreciate the argument and the suggestion.  But,

19   certainly, I have on occasion departed beyond what

20   the government has recommended for the very purpose

21   of indicating to a particular defendant that there

22   is a judicial recognition of the significance of

23   cooperation.  But every case depends on its own

24   facts, of course.

25       I place significance on the extent and quality

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 147 of 163 PageID #: 1568
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 73 of 80 PageID 248

73

1    of the government's -- or the assessment of the

2    quality and significance of the defendant's

3    cooperation by the government.  That is why I

4    pondered what seemingly was a slightly different

5    approach in the unrelated but similar case.

6         I am not necessarily persuaded by this

7    argument that this district, this United States

8    Attorney's Office does not fairly and adequately

9    assess cooperation.  That is an executive function.

10   And it certainly differs from jurisdiction to

11   jurisdiction.  But I can only deal with what is

12   before me.  This United States Attorney's Office has

13   determined an eight-level departure is appropriate.

14        Several matters stand out to me in addition to

15   the voluntary disgorgement, which I don't choose to

16   characterize as super acceptance of responsibility.

17   I think it certainly is perhaps accurately called

18   that.  But at the same time, as I said, he is able

19   to do what he can do because he's in a position to

20   do that.  It simply is a factor I will consider in

21   imposing an appropriate sentence.  I don't believe

22   it to be a basis for a downward departure.  It's

23   more appropriately considered a basis for a

24   variance.

25        Conditions of confinement, I do not find

1       anything in the description that justifies a

2       downward departure.   Incarceration is what it is.

3       He certainly has not been mistreated.  He has been

4       fed, cared for, provided the comfort and security of

5       a safe prison environment, absent of which he may

6       very well have been subjected to retaliatory

7       measures.

8            His family has relocated.  They have been able

9       to avail themselves of the generosity of the United

10      States government.  That has mitigated at least to

11      some degree the risk attendant to this defendant's

12      drug activities; a benefit, in my view, to the

13      defendant.

14           Ultimately, having considered all these

15      matters, it simply is a matter of how much time is

16      sufficient but not greater than necessary to reflect

17      the statutory purposes of sentencing.

18           Considering the defendant's cooperative

19      efforts, the extent of the disgorgement, his

20      voluntary coming forward in Argentina with his

21      attorney to begin this process, waiving extradition,

22      or at least consenting to extradition, being

23      available to the agent on countless occasions, being

24      available to distant United States Attorney's

25      Offices for cooperation, all of those matters are

1       certainly matters which should be reflected in the

2       sentence.

3              Ultimately, the sentence should promote

4       respect for the law, act as a deterrent and protect

5       the public. Apparently that's working, Mr. White,

6       because these higher-up traffickers are beginning to

7       come forward on their own, realizing that their

8       apparent days of liberty are numbered. So I suspect

9       that that is a semblance of deterrence. You would

10      know more than me.

11             Having considered all these matters, I have

12      determined, after granting the 5K1.1 motion, which

13      is docket 58, I'm going to depart downward ten

14      levels to a level 33 to reflect, in addition to the

15      government's evaluation of the defendant's

16      cooperative effort's, the Court's evaluation.

17             He may or may not be back before the Court for

18      an additional consideration under Rule 35. I

19      presume that he will. That would take this

20      defendant to a level 33, a range of 135 to 168

21      months.

22             I am going to vary from that, however, and

23      impose a sentence pursuant to the Sentencing Reform

24      Act of 1984 to a terms of 120 months as to Counts

25      One, Two, Four and Five, consistent with the

1   statutory minimum mandatory penalty, but also in

2   recognition of the defendant's substantial

3   assistance.  A sentence at the level suggested by

4   defense counsel would not promote the statutory

5   purposes of sentencing.  As to Count Three, a

6   sentence, likewise, of ten years, those terms to run

7   concurrent.

8        Upon his release, he will serve a five-year

9   period of supervised release as to each count.

10  Those terms, again, to run concurrent.  Subject to

11  the standard terms and conditions adopted by this

12  court, special conditions being if he is deported,

13  he shall not reenter the United States without the

14  express permission of the United States government.

15       If he is supervised, which I presume he may

16  be, he is subject to the mandatory drug testing

17  requirements of the Violent Crime Control Act.  This

18  is a qualifying felony.  He will cooperate in the

19  collection of DNA as directed by his probation

20  officer.  He will provide probation with access to

21  all financial information upon request.

22       What says the government as to a fine?

23       MR. RUDDY:  Your Honor, the defendant does

24  possess significant assets, none of which are in the

25  United States.

```
1              THE COURT:  But he does have the ability to
2    pay a fine, assuming he liquidates those assets.
3              MR. RUDDY:  Yes, sir.
4              THE COURT:  Mr. White, any comments on that,
5    sir?
6              MR. WHITE:  Judge, the only thing I can tell
7    you is that the assets that are listed in paragraph
8    -- paragraph 75 of the PSI, there's six properties.
9    We've actually in an effort to -- there's a
10   forfeiture procedure happening in Colombia.  These
11   assets, we were attempting to forfeit to the
12   Colombian government.  That has not happened.  So
13   all I can tell you is these are assets.  They still
14   exist.  They still have a value.  And I don't know
15   what efforts can be made to try to liquidate those.
16             THE COURT:  All right.  I'll impose a fine of
17   $50,000, recognizing that the defendant does have
18   the ability to pay, although with some difficulty.
19   He is also assessed a 500-dollar special assessment.
20   That's $100 per count of conviction, which is due
21   immediately.
22             Is there a separate forfeiture order sought by
23   the government?
24             MR. RUDDY:  I don't believe so, Your Honor.
25             THE COURT:  All right.  Of course, by the
```

```
 1        extent of his -- as a result of his cooperative

 2        efforts under Section 5K1.1, this defendant is not

 3        subject to the minimum mandatory penalties provided

 4        by law.

 5             What says the government as to the underlying

 6        indictment?

 7             MR. RUDDY:  Oh, Your Honor, we move to dismiss

 8        the original indictment.

 9             THE COURT:  As to this defendant, that motion

10        is granted.  The original indictment is dismissed.

11             Mr. White, do you have a facility you'd like

12        me to recommend?

13             MR. WHITE:  Yes, Judge.  Anywhere close to the

14        southern -- South Florida area, please.

15             THE COURT:  Well, there's one.  Obviously, we

16        have Coleman here and Miami down in --

17             MR. WHITE:  Coleman first, Miami second.  I'm

18        sorry, Miami first, Coleman second.  Excuse me.

19             THE COURT:  Okay.  I'll recommend designation

20        at Miami and alternatively Coleman.

21             Having pronounced sentence, are there any

22        objections to the sentence imposed or the manner in

23        which it has been pronounced?  Mr. Ruddy?

24             MR. RUDDY:  No, Your Honor.

25             THE COURT:  Mr. White?
```

1              MR. WHITE:  No, Your Honor.

2              THE COURT:  Gentlemen, thank you.  Let me then

3      advise Senor Caicedo-Velandia, you do have 14 days

4      to appeal the judgment and sentence of the Court.

5      You are entitled to be represented by an attorney.

6      If you're not able to pay one, the Court will

7      appoint a lawyer to represent you on appeal, and the

8      clerk will accept your appeal without payment of the

9      filing fee.

10             Mr. White will review with you the advantages

11     and disadvantages of filing an appeal, not the least

12     of which is the effect on your eligibility for a

13     Rule 35 motion.  It is your decision, however.  Just

14     be aware that you must make that decision within 14

15     days so that the appeal can be filed timely.

16             And if you determine not to appeal, of course,

17     your attorney will document his file to reflect that

18     important decision.  Do you have any questions about

19     that, sir?

20             THE DEFENDANT:  No.

21             THE COURT:  All right.  Buenos suerte, Senor.

22     Thank you, gentlemen.

23             COURTROOM SECURITY OFFICER:  All rise.

24             (Proceedings concluded at 3:15 PM.)

25

Case 1:10-cr-00288-ILG  Document 170  Filed 10/18/19  Page 154 of 163 PageID #: 1575
Case 8:08-cr-00152-JDW-MAP  Document 66  Filed 01/05/12  Page 80 of 80 PageID 255

80

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF FLORIDA          )

 4     COUNTY OF HILLSBOROUGH    )

 5         I, Linda Starr, RPR, Official Court Reporter for

 6     the United States District Court, Middle District,

 7     Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 80, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 4th day of January 2012.

19

20

21              /s/ Linda Starr
                Linda Starr, RPR, Official Court Reporter
22

23

24

25
```

AO 245B  (Rev 06/05) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

vs.

LUIS AGUSTIN CAICEDO-VELANDIA
a/k/a "Don Luis," a/k/a "Don Lucho"

### JUDGMENT IN A CRIMINAL CASE

CASE NUMBER:   8:08-CR-152-T-27MAP
USM NUMBER:   51844-018

Defendant's Attorney: Jay A. White & Jeffrey Brown

THE DEFENDANT:

 X  pleaded guilty to count(s) One through Five of the Superseding Indictment.
 __ pleaded nolo contendere to count(s) which was accepted by the court.
 __ was found guilty on count(s) after a plea of not guilty.

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 21 U.S.C. § 963 and 960(b)(1)(B)(ii) | Conspiracy to Distribute Five Kilograms or More of Cocaine | April 12, 2010 | One |
| 46 U.S.C. §§ 70503(a), 70506(a), and (b); and 21 U.S.C. § 960(b)(1)(B)(ii) | Conspiracy to Distribute Five Kilograms or More of Cocaine on Board a Vessel Subject to the Jurisdiction of the United States | April 12, 2010 | Two |
| 21 U.S.C. § 848 | Engagement in a Continuing Criminal Enterprise by Violation of Three or More Occasions of Various Felony Provisions | April 12, 2010 | Three |
| 46 U.S.C. §§ 1903(a) and 1903(g); 21 U.S.C. §§ 960 (b)(1)(B)(ii); and 18 U.S.C.§ 2 | Aiding and Abetting Persons on Board a Vessel to Knowingly Distribute Five Kilograms or More of Cocaine | April 16, 2005 | Four |
| 46 U.S.C. §§ 1903(a) and 1903(g); 21 U.S.C. §§ 960 (b)(1)(B)(ii); and 18 U.S.C.§ 2 | Aiding and Abetting Persons on Board a Vessel to Knowingly Distribute Five Kilograms or More of Cocaine | June 9, 2005 | Five |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

 __ The defendant has been found not guilty on count(s)
 X  The Original Indictment is dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in economic circumstances.

Date of Imposition of Sentence: July 11, 2011

JAMES D. WHITTEMORE
UNITED STATES DISTRICT JUDGE

DATE: July 12th, 2011

AO 245B (Rev 06/05) Sheet 2 - Imprisonment (Judgment in a Criminal Case)

| | | |
|---|---|---|
| Defendant: | LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho" | Judgment - Page 2 of 6 |
| Case No.: | 8:08-CR-152-T-27MAP | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **ONE HUNDRED TWENTY (120) MONTHS as to Counts One, Two, Three, Four, and Five; CONCURRENT.**

Defendant shall be given credit toward the service of a term of imprisonment for any time he/she has spent in official detention prior to the date the sentence commences -- (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the Defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence. 18 U.S.C. § 3585(b).

 X  The Court makes the following recommendations to the Bureau of Prisons:  The Court recommends confinement at Miami, or Coleman, alternatively.

 X  The defendant is remanded to the custody of the United States Marshal.
___ The defendant shall surrender to the United States Marshal for this district.

    ___ at ___ a.m./p.m. on ___.
    ___ as notified by the United States Marshal.

___ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons.

    ___ before 2 p.m. on ___.
    ___ as notified by the United States Marshal.
    ___ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

                                      _____
                                        United States Marshal

By:_____
                                     Deputy United States Marshal

AO 245B (Rev. 06/05) Sheet 3 - Supervised Release (Judgment in a Criminal Case)

| | | |
|---|---|---|
| Defendant: | LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho" | Judgment - Page 3 of 6 |
| Case No.: | 8:08-CR-152-T-27MAP | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **FIVE (5) YEARS as to Counts One, Two, Three, Four, and Five; CONCURRENT.**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.
The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

___ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. However, the Court orders the defendant to submit to random drug testing not to exceed 104 tests per year. (Check, if applicable).

___ The defendant shall not possess a firearm, destructive device, or any other dangerous weapon. (Check, if applicable.)

_X_ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

___ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works or is a student, as directed by the probation officer. (Check, if applicable.)

___ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 06/05) Sheet 3C - Supervised Release (Judgment in a Criminal Case)

| | | |
|---|---|---|
| Defendant: | LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho" | Judgment - Page 4 of 6 |
| Case No.: | 8:08-CR-152-T-27MAP | |

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of super vised release:

__X__  Should the defendant be deported, he/she shall not be allowed to re-enter the United States without the express permission of the appropriate governmental authority.

AO 245B (Rev 06/05) Sheet 5  - Criminal Monetary Penalties (Judgment in a Criminal Case)

| Defendant: | LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho" | Judgment - Page 5 of 6 |
|---|---|---|
| Case No.: | 8:08-CR-152-T-27MAP | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Total Restitution** |
|---|---|---|---|
| **Totals:** | $500.00 | $50,000.00 | N/A |

\_\_\_   The determination of restitution is deferred until \_\_\_\_.   An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

\_\_\_   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| Totals: | $ \_\_\_ | $ \_\_\_ | |

\_   Restitution amount ordered pursuant to plea agreement  $ _____.

\_   The defendant must pay interest on a fine or restitution of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

\_   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

\_   the interest requirement is waived for the \_\_\_   fine \_\_\_   restitution.

\_   the interest requirement for the \_\_\_   fine \_\_\_   restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for the offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev 06/05) Sheet 6 - Schedule of Payments (Judgment in a Criminal Case)

| Defendant: | LUIS AGUSTIN CAICEDO-VELANDIA a/k/a "Don Luis," a/k/a "Don Lucho" | Judgment - Page 6 of 6 |
|---|---|---|
| Case No.: | 8:08-CR-152-T-27MAP | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A.　 __X__ 　Lump sum payment of $ _50,000.00 and $500.00_ due immediately, balance due

　　　　　___ not later than _____ , or

　　　　　___ in accordance ___ C, ___ D, ___ E or ___ F below; or

B.　 __ 　Payment to begin immediately (may be combined with ___ C, ___ D, or ____ F below); or

C.　 __ 　Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ days (e.g., 30 or 60 days) after the date of this judgment; or

D.　 __ 　Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____, (e.g., months or years) to commence _____ (e.g. 30 or 60 days) after release from imprisonment to a term of supervision; or

E.　 __ 　Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time, or

F.　 __ 　Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

　_　　Joint and Several

　　　Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

　_　　The defendant shall pay the cost of prosecution.

　_　　The defendant shall pay the following court cost(s):

　_　　The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

v.                                                    **CASE NO. 8:08-CR-152-T-27MAP**

**LUIS AGUSTIN CAICEDO-VELANDIA**

_____/

### ORDER

**BEFORE THE COURT** is the Motion by the United States for Reduction of Defendant's

Sentence, pursuant to Rule 35(b) (Dkt. 70) and Defendant's Response (Dkt. 71). Upon consideration,

1.      The Motion by the United States for Reduction of Defendant's Sentence, pursuant to

Rule 35(b) is **GRANTED.** Defendant is hereby committed to the custody of the Bureau of Prisons

for imprisonment for a period of **TIME SERVED.**[1] The term of supervised release previously

imposed shall remain the same.

2.      The Clerk deliver two certified copies of this Order to the United States Marshal or

other qualified officer and the copy serve as the commitment of the defendant.

**DONE AND ORDERED** at Tampa, Florida this _11_th day of June, 2015.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies:
U.S. Attorney's Office
Defense Counsel
U.S. Marshal
U.S. Probation
Bureau of Prisons

---

[1] Defendant was originally sentenced to 120 months imprisonment. The Government's Rule 35 motion requests a five level departure. Calculating from an Offense Level 30 (97-121 months), departing five levels results in a base offense level of 25 (57-71 months). Defendant has served approximately sixty months of his sentence (See Dkt. 71), therefore a sentence of time served is appropriate.

██████████████████████

January 10, 2019

The Honorable I. Leo Glasser
United States District Judge

Dear Your Honor,

At first, I thank God for permitting me this opportunity to write this simple letter to Your Honor about ████████████ Luis Caicedo. ████████████ to be sentenced by Your Honor this month.

My brother Luis and I grew up in a middle-class family in Colombia from the 1960s to the 80s. Our father owned a vehicle repair workshop, but he passed away ████████ ████████████ (in 1980). Our aunts helped my mother with our family ████████ █████████████████

My father taught us the way to improve our lives and to be successful was through study, effort and hard work. We children all followed his advice.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████
██████████████████████████████████████

I want to apologize to Your Honor, ███████████████████████ for the very grave mistakes my brother Luis has made and which have brought him to Your Honor for sentencing. I also want to mention here a few things about Luis, in the hopes that they assist Your Honor ██████████

I did not have too much contact with my brother Luis in the recent past, ████████████████████████ but I do remember my brother Luis as always a friendly, kind, calm, respectful, generous, loving person, especially toward our mother and our aunts.

I also remember that he tried at one point in his life to study economics and law at university in Colombia, and that he was always a positive and optimistic person.

When my brother Luis was around eighteen years old, I remember there was a young child near where we lived, who had surgery on his legs and for a while could not walk by himself and so could not get himself to school on his own. I found out that my brother Luis picked up this child every day for two months and brought him to school, until he recovered enough to go on his own. I found out about this because one day the father of the boy met me and asked why my brother didn't accept any money for helping them. I told him simply that my brother Luis likes to help people when he can, and that he does not do it for money. That's my brother as I know him, as I remember him, and as I love him.

I know that my request to Your Honor ████████████████████████ is coming from a simple person, who fully relies on God and recognizes that my brother committed great errors. I ask for forgiveness again, and rely on the mercy, compassion, majesty, authority and wisdom of those who make the decisions.

My brother needs an opportunity to rebuild his life and make up for his mistakes with his family and society.